[No. S058956. Aug. 6, 1998.]

RICHARD RIDER et al., Plaintiffs and Appellants, v.
CITY OF SAN DIEGO et al., Defendants and Respondents.

**COUNSEL**

Carl Fabian, Eric Norby and Lewis A. Wenzell for Plaintiffs and Appellants.

John W. Witt and Casey G. Gwinn, City Attorneys, Leslie J. Girard and Deborah L. Berger, Deputy City Attorneys, Luce, Forward, Hamilton & Scripps, Charles A. Bird, Thomas A. May, Seltzer, Caplan, Wilkins & McMahon, Julia P. Dubick and Virginia C. Pearson for Defendants and Respondents.

O'Melveny & Myers, Richard M. Jones, Brian S. Currey, Kenneth R. O'Rourke, Orrick, Herrington & Sutcliffe, Paul A. Webber, Robert E. Freitas and W. Douglas Kari as Amici Curiae on behalf of Defendants and Respondents.

**OPINION**

**CHIN, J.**—In this case, we consider the validity of a financing plan under which a joint powers agency will issue bonds, use the bond proceeds to construct a capital improvement, and lease that improvement to a city. We conclude that the voter approval requirements that would apply if the city issued the bonds do not, by their terms, apply to the debts of a joint powers agency, and the city's obligation to make rent payments to the joint powers agency does not itself constitute a debt requiring voter approval. We also conclude that the law governing joint powers agencies gives these agencies independent authority to issue bonds without complying with restrictions, such as voter approval requirements, that apply to local governments. Finally, we conclude that state law does not in this regard violate the "home rule" provision of the California Constitution. Accordingly, we affirm the judgment of the Court of Appeal.

### FACTUAL AND PROCEDURAL BACKGROUND

The San Diego Unified Port District (Port District) owns the San Diego Convention Center (Convention Center). The Port District is an independent

governmental entity existing under state law and encompassing the Cities of San Diego, Chula Vista, Coronado, National City, and Imperial Beach. (Harb. & Nav. Code, appen. 1, § 5, subd. (a).) The City of San Diego (City) operates the Convention Center under a management agreement with the Port District. On June 21, 1994, the City and the Port District entered into a memorandum of understanding in which they agreed to expand the Convention Center and to finance the expansion through a third party specially created for that purpose. To implement this plan, the Port District and the City entered into a joint powers agreement (Gov. Code, § 6503.5) creating the Convention Center Expansion Financing Authority (Financing Authority) as "a public entity separate from the City and the District." The City, the Port District, and the Financing Authority then entered into the following agreements and transactions.

First, the Port District agreed to lease the existing Convention Center and the site of the planned expansion to the Financing Authority for $2.

Second, the Financing Authority arranged to issue "Lease Revenue Bonds" in an amount not to exceed $205 million. The indenture provided that the Financing Authority had to use the bond proceeds to cover financing costs and to pay, at the City's direction, the cost of the Convention Center expansion.

Third, the Financing Authority agreed to sublease the Convention Center and the expansion to the City. The City agreed to pay rent equal to the debt service on the bonds, including interest and principal, and additional rent to cover the Financing Authority's administrative expenses. Thus, in effect, the City agreed to provide funds to meet all the Financing Authority's obligations as they arose, calling those funds rent payments. The City also agreed to include these rent payments in its budget each year.

Fourth, the Port District agreed to pay the City $4.5 million annually for 20 years to help the City meet its obligations to the Financing Authority.

Fifth, when the Financing Authority had made all interest and principal payments on the bonds, it agreed that title to the Convention Center expansion would vest in the Port District, which owns the existing Convention Center. At the same time, the various leases would expire, and the Financing Authority would automatically cease to exist.

The Port District and the City approved all these agreements and related documents on March 5, 1996. The Financing Authority approved the agreements on May 1, 1996. On May 3, 1996, plaintiffs filed this action, challenging the validity of the financing plan under Code of Civil Procedure

section 863, which permits "any interested person [to] bring an action . . . to determine the validity" of certain public agency matters. Plaintiffs named the City and the Financing Authority as defendants. These defendants filed answers, and the Coalition to Protect the Economy also appeared and answered under Code of Civil Procedure section 862, which allows "[a]ny party interested" to appear in an action of this type.

In their complaint, plaintiffs asserted that the Financing Authority has no existence independent of the City, but rather is a mere financing "shell" that acts at the City's behest, doing for the City what the City may not do in its own name. They noted that article XVI, section 18, of the California Constitution (section 18) prohibits the City from "incur[ring] any indebtedness . . . exceeding in any year the income and revenue provided for such year, without the assent of two-thirds of the qualified electors," and article VII, section 90(a), of the City's charter imposes a similar two-thirds vote requirement. Plaintiffs argued that the financing of the Convention Center expansion without voter approval violates these restrictions.

Defendants moved for summary judgment, and the trial court granted the motion, finding the financing plan valid. (Code Civ. Proc., § 870, subd. (a).) The Court of Appeal affirmed, holding that the City's obligation to pay rent to the Financing Authority "did not create debt within the meaning of . . . section 18," because "the lease provisions do not create present debt for future payments owed." The Court of Appeal also held that, under the Joint Exercise of Powers Act (Gov. Code, § 6500 et seq.) (the Act), the Financing Authority is not subject to the restrictions on issuing debt that apply to the City, and the Act does not, in this regard, violate the "home rule" provision of the California Constitution. (Cal. Const., art. XI, § 5, subd. (a).)

Because of the widespread use of similar financing plans throughout the state, and because any doubt about the validity of these financing plans could impact the cost of capital for the improvement of public resources, we granted review.

### DISCUSSION

Plaintiffs make three somewhat overlapping arguments. First, they argue that we should not permit the City to circumvent the constraints of the two-thirds vote requirement simply by creating a shell entity—the Financing Authority—to do what the City cannot do on its own. Specifically, they argue that the two-thirds vote requirement applies to the debts of the Financing Authority and that, in any case, the City's obligation to pay rent to the Financing Authority constitutes a debt requiring voter approval. Second,

plaintiffs argue that the Act subjects the Financing Authority to the same restrictions that apply to the City, including the limitations on "incur[ring] . . . indebtedness," and therefore the Financing Authority cannot do what the City would not be able to do. Third, plaintiffs argue that, if the Act permits the Financing Authority to issue bonds without complying with the two-thirds vote requirement in the City's charter, then to that extent it violates the "home rule" provision of the California Constitution. We address these arguments in turn.

1) *The two-thirds vote requirement does not extend to the debts of the Financing Authority, and the City's obligation to pay rent to the Financing Authority does not itself constitute a debt requiring voter approval.*

 Plaintiffs argue that the Financing Authority is a hollow shell that exists only on paper. For all practical purposes, they argue, the Financing Authority is the City. The City's mayor and city manager make up half of the Financing Authority's governing board; the City's funds cover the expenses of the Financing Authority, including payments on the bonds; the City controls construction of the Convention Center expansion; the City operates the expanded Convention Center; and the Financing Authority automatically dissolves once its purpose is fulfilled. Thus, plaintiffs argue that, through the legal equivalent of smoke and mirrors, the City has arranged to do what the Constitution and the City's charter do not permit it to do: issue bonds without the approval of two-thirds of the electorate. Plaintiffs refer to the Financing Authority as a "shadow government[]" and describe the financing plan variously as a "subterfuge," "artifice," "ruse," and "scheme[]." Plaintiffs also remind us of local government efforts to circumvent the constitutional requirement of a two-thirds vote of the electorate to impose certain "special taxes." (Cal. Const., art. XIII A, § 4; see generally, *Rider* v. *County of San Diego* (1991) 1 Cal.4th 1 [2 Cal.Rptr.2d 490, 820 P.2d 1000].) They argue that, in this case, a local government—i.e., the City—is once again trying to circumvent constitutional constraints.

The short answer to plaintiffs' argument is that the Constitution and the City's charter permit the City to avoid the two-thirds vote requirement by creating a joint powers agency to finance public works projects. Therefore, however we might characterize the financing plan at issue here, we cannot characterize it as unlawful.

Section 18 provides: "No *county, city, town, township, board of education, or school district*, shall incur any indebtedness . . . exceeding in any year the income and revenue provided for such year, without the assent of

two-thirds of the qualified electors . . . ." (§ 18, italics added.) The Constitution does not include joint powers agencies in this list of public entities that cannot incur indebtedness without a two-thirds vote. Though plaintiffs analogize section 18 to the provision of the state Constitution that requires a similar two-thirds vote to impose special taxes, the latter provision is quite different. It states: "Cities, Counties *and special districts*, by a two-thirds vote of the qualified electors of such district, may impose special taxes . . . ." (Cal. Const., art. XIII A, § 4, italics added.) In *Rider* v. *County of San Diego*, we interpreted the term "special district" in this provision to "include any local taxing agency created to raise funds for city or county purposes to replace revenues lost by reason of the restrictions of Proposition 13 [(i.e., Cal. Const., art. XIII A)]." (*Rider* v. *County of San Diego, supra*, 1 Cal.4th at p. 11.) Section 18 includes no broad term analogous to "special district" that we might construe to include a joint powers agency. Rather, it lists six specific types of governmental entities that may not incur indebtedness without a two-thirds vote, and, though plaintiffs might wish otherwise, joint powers agencies are not on the list. Similarly, though the City's charter places restrictions *on the City* when it incurs certain debt, nothing in that charter indicates that those restrictions apply to a *joint powers agency* that the City might create.

As noted, plaintiffs argue that the City controls the Financing Authority, and therefore the Financing Authority, as an alter ego of the City, is one of the governmental entities included in section 18. The Court of Appeal rejected a similar argument in *Vanoni* v. *County of Sonoma* (1974) 40 Cal.App.3d 743 [115 Cal.Rptr. 485] (*Vanoni*). In that case, the plaintiffs argued that the Sonoma County Flood Control and Water Conservation District (district) was indistinguishable from the County of Sonoma for purposes of the constitutional debt limitation. (*Id.* at p. 748.) The district had the same boundaries as the county, the county board of supervisors sat ex officio as the governing board of the district, lower level county officials sat ex officio as officials of the district, and the district performed traditional county functions. (*Id.* at pp. 745-746, 748-749.) Nevertheless, the Court of Appeal found insufficient evidence "that Sonoma County exercises actual control over the actions of the district" (*id.* at p. 750), and, therefore, the court held that the district was a separate legal entity from the county. (*Id.* at p. 749.)

If the facts of *Vanoni* did not establish that the district was indistinguishable from Sonoma County, then the facts in this case certainly do not establish that the Financing Authority is indistinguishable from the City. In *Vanoni*, the district had geographic boundaries coterminous with the county, it had the power to levy taxes on property within those boundaries, and the

same individuals sat on the governing boards of both the county and the district. Here, on the other hand, the Financing Authority has no geographic location or boundaries, has no taxing power, and City officials make up only half of its governing board.

Moreover, though the *Vanoni* decision turned on the question of control, we have never held that control by itself establishes the identity of two separate governmental entities. Our adoption of the "essential control" standard in *Rider* v. *County of San Diego, supra,* 1 Cal.4th at pages 11-12, was in the context of construing the term "special districts" in Proposition 13. (Cal. Const., art. XIII A, § 4.) We stated that, when a city or county creates and "essentially control[s]" a local taxing agency, a court can infer that the agency is a "special district" "created to . . . circumvent Proposition 13." (*Rider* v. *County of San Diego, supra,* 1 Cal.4th at p. 11, italics omitted.) But, as noted, the constitutional debt limitation in section 18 includes no broad term analogous to "special district" that might encompass entities, such as joint powers agencies, that a city or county creates and controls. Therefore, the essential control standard does not apply. In *Rider* v. *County of San Diego,* we expressly rejected the conclusion that the essential control standard established the identity of two separate governmental entities: "Rather than attempting to demonstrate that the subject agency and county are *identical* entities, application of the 'essential control' test simply affords ground for reasonably inferring an intent to circumvent Proposition 13." (*Rider* v. *County of San Diego, supra,* 1 Cal.4th at p. 12.)

Furthermore, this case is factually distinct from *Rider* v. *County of San Diego.* In *Rider* v. *County of San Diego,* the county sought to impose additional taxes without obtaining the necessary two-thirds voter approval. To help the county fulfill this goal, the Legislature created an entity whose only purpose was to impose the taxes and pass the tax revenues to the county. From both the voters' and the county's perspectives, the arrangement was no different than if the county had imposed the taxes directly. (*Rider* v. *County of San Diego, supra,* 1 Cal.4th at pp. 5-6.) In contrast, the financing arrangements in this case insulate the City in a real economic sense from prohibited "indebtedness." The City is required to pay each year only for its use of the Convention Center during that year; the City's obligation to pay rent abates if, for any reason, it loses use of the property; and the Financing Authority has waived any right to accelerated payment of rent in the event of breach. Thus, the City has not assumed a large, multiyear indebtedness comparable to the Financing Authority's debt. Because the Financing Authority has a genuine separate existence from the City (see Gov. Code, § 6503.5), it does not matter whether or not the City "essentially controls" the Financing Authority.

Plaintiffs urge us to look beyond the form of the transaction and recognize that, in substance, the City is liable for the Financing Authority's debt. Plaintiffs do not persuade us. The Financing Authority, not the City, issued the bonds, and, by law, the Financing Authority's debts are not the City's debts. (Gov. Code, §§ 6508.1, 6551.) Moreover, the bond itself provides: "NEITHER THIS BOND NOR THE PAYMENT OF THE PRINCIPAL OR ANY PART THEREOF NOR ANY INTEREST THEREON CONSTITUTES A DEBT, LIABILITY OR OBLIGATION OF THE CITY OF SAN DIEGO . . . ." Therefore, the bondholders must look to the Financing Authority, not the City, for satisfaction of the debt. The City's only liability under the transaction is its ongoing duty to make rent payments to the Financing Authority. If a third party has a right to receive those rent payments, it is only because the Financing Authority assigned its right to that third party, perhaps in order to facilitate the mechanics of repaying the bonds. That circumstance does not make the City liable for the Financing Authority's debt.

Plaintiffs next argue that the City's ongoing duty to make rent payments itself constitutes an "indebtedness . . . exceeding [one year's] income and revenue," triggering the two-thirds vote requirements of the Constitution and the City's charter. (§ 18; see also San Diego City Charter, art. VII, § 90(a).) We rejected a similar argument in *City of Los Angeles* v. *Offner* (1942) 19 Cal.2d 483 [122 P.2d 14, 145 A.L.R. 1358] (*Offner*) and *Dean* v. *Kuchel* (1950) 35 Cal.2d 444 [218 P.2d 521] (*Dean*), and we see no reason to overrule those decisions now. We discuss *Offner* and *Dean* below, but first, by way of background, we analyze briefly the contours of section 18's debt limitation.

When section 18 refers to "indebtedness," it includes within that term all the obligations of the local government during the relevant fiscal year. (*San Francisco Gas Co.* v. *Brickwedel* (1882) 62 Cal. 641, 642 (*San Francisco Gas*).) Therefore, a city can violate the constitutional requirement by incurring even a very small debt if the city's other obligations during that year have already exhausted the city's total revenues for the year. (*Ibid.*) For this reason, section 18 is more accurately understood as mandating balanced budgets than merely as regulating the debt financing of public capital improvements. As we stated in *San Francisco Gas*: "The system previously prevailing in some of the municipalities of the State by which liabilities and indebtedness were incurred by them far in excess of their income and revenue for the year in which the same were contracted, thus creating a floating indebtedness which had to be paid out of the income and revenue of future years, and which, in turn, necessitated the carrying forward of other indebtedness, was a fruitful source of municipal extravagance. The evil consequences of that system had been felt by the people at home and

witnessed elsewhere. It was to put a stop to all of that, that the constitutional provision in question was adopted." (*San Francisco Gas, supra,* 62 Cal. at p. 642; see also *City of Long Beach* v. *Lisenby* (1919) 180 Cal. 52, 56 [179 P. 198].)

 Certain exceptions or limitations to the balanced budget requirement of section 18 are almost as old as the requirement itself. One commentator has suggested that the willingness of the courts to recognize and perpetuate these exceptions reflects "a concern for economic development and a perception that the debt limit [i]s too rigid and restrictive for the needs of a modern, urbanized population." (Kosel, *Municipal Debt Limitation in California* (1977) 7 Golden Gate L.Rev. 641, 645.) That observation may be valid, or perhaps our decisions have simply recognized that section 18's restrictions were not so much designed to discourage public investment in capital improvements as to mandate fiscal responsibility. Regardless of what principles might have motivated our decisions, certain exceptions to section 18 are firmly rooted in our jurisprudence.

First, we have long held that the debt limitation in section 18 only applies to discretionary debt, not to obligations imposed by state law. (*City of Long Beach* v. *Lisenby, supra,* 180 Cal. at pp. 57-58 [state law duty to pay tort judgment]; *Lewis* v. *Widber* (1893) 99 Cal. 412, 413 [33 P. 1128] [state law duty to pay salary of chief clerk in office of registrar of voters].) Notably, we have applied this principle to permit counties to incur significant debt for the construction of capital improvements. (*County of Los Angeles* v. *Byram* (1951) 36 Cal.2d 694, 698-700 [227 P.2d 4] [construction of county court building].)

Second, we have long held that the debt limitation in section 18 does not apply to debts that a local government will pay from nontax revenues it holds in a special fund. For example, in *San Francisco S. Co.* v. *Contra Costa Co.* (1929) 207 Cal. 1 [276 P. 570], we found the two-thirds vote requirement inapplicable to bonds that the County of Contra Costa issued for the improvement of streets within a specified assessment district. The street improvement directly benefited the properties located within the district, and the county levied a special assessment on those properties and placed the revenues in a special fund for the payment of the bonds. (*Id.* at p. 4.) The bonds were payable from the special fund " 'exclusively.' " (*Ibid.*) We held that the county merely acted as the agent of the property owners and "incurs no liability whatsoever." (*Ibid.*) Because "[t]he cost of the proceedings is borne by the property benefited" (*ibid.*), we found the two-thirds vote requirement inapplicable. (*Id.* at p. 5; see also *City of Oxnard* v. *Dale* (1955) 45 Cal.2d 729, 737 [290 P.2d 859] [two-thirds vote requirement not applicable to bonds issued to fund sewer expansion because city would repay bonds with revenues from sewer system].)

Third and most relevant here, we have long held that the debt limitation in section 18 does not apply when a local government enters into a contingent obligation. "A sum payable upon a contingency is not a debt, nor does it become a debt until the contingency happens. [Citation.]" (*Doland* v. *Clark* (1904) 143 Cal. 176, 181 [76 P. 958]; see also *California Pac. Title & Trust Co.* v. *Boyle* (1930) 209 Cal. 398, 404, 407 [287 P. 968]; *Smilie* v. *Fresno County* (1896) 112 Cal. 311, 313 [44 P. 556]; *McBean* v. *City of Fresno* (1896) 112 Cal. 159, 167 [44 P. 358].) We have repeatedly applied this principle to uphold multiyear contracts in which the local government agrees to pay in each successive year for land, goods, or services provided during that year. (*Ibid.*) These contracts allow local governments to avoid price volatility from year to year and to negotiate lower prices overall by making long-term commitments. The classic example of this type of contract is a lease agreement. In such cases, we have reasoned that a debt for the aggregate of all rent payments does not arise at the time the parties execute the lease so long as liability for each individual rent payment is contingent on continued use of the leased property during the period corresponding to that rent payment. (*Doland* v. *Clark, supra,* 143 Cal. at p. 181.)

Local governments have taken advantage of this principle to enter into lease-purchase agreements without obtaining the approval of two-thirds of the electorate, and we have upheld these arrangements. For example, in *Offner*, we approved a plan under which the City of Los Angeles would lease an incinerator from a private party with an option to purchase the incinerator at various intervals in the lease term. Under the city's plan, the city would first lease land to the private party for $1 per month. (*Offner, supra,* 19 Cal.2d at p. 484.) The private party would agree to construct an incinerator on the land within nine months and lease the land and the incinerator back to the city for a monthly rental to be determined by competitive bid. (*Ibid.*) At various intervals, the city would have the option of purchasing the incinerator at its then appraised value, subject to certain limitations. (*Id.* at pp. 484-485.) If the city did not purchase the incinerator, the private party would have an opportunity to remove it from the land at the end of the lease term. (*Id.* at p. 485.) We held that the two-thirds vote requirement did not apply, rejecting the argument that the lease would be in essence a sales contract with payment of the purchase price in a series of installments. (*Id.* at p. 487.) We noted that the terms of the lease were reasonable, and at no time did the city have a "right to purchase the incinerator at less than its fair appraised value." (*Ibid.*) Thus, "the city is not required to exercise the option in order to protect its prior investment in the form of rental payments." (*Ibid.*)

In *Dean, supra,* 35 Cal.2d 444, we significantly broadened our holding in *Offner*, approving a financing plan that has many of the characteristics of the

financing plan now before us. Significantly, we applied *Offner* although the transaction involved an automatic transfer of title at the end of the lease term, not an option to purchase at fair market value. Thus, the rent payments in *Dean* looked much more like installment payments on the purchase price than did the rent payments in *Offner*.

In *Dean*, the state leased real property to Pacific-Southwestern Company for a term of 35 years for the sum of $1. (*Dean, supra,* 35 Cal.2d at p. 445.) The company agreed to erect an office building on the land and lease the land and building back to the state for a term of 25 years at a monthly rent of $3,325. (*Ibid.*) The rental payments were " 'in consideration of the use and occupancy of the . . . building[] . . . during each month for which said monthly rental is to be paid.' " (*Ibid.*) At the expiration of the 25-year building lease, the 35-year ground lease ended, and title in the land and the building vested in the state with no additional payment. (*Id.* at p. 446.)

The State Controller challenged the arrangement, arguing that it violated a constitutional limitation analogous to section 18, but applicable to state debt. We upheld the transaction: " '[I]f the lease or other agreement is entered into in good faith and creates *no immediate indebtedness for the aggregate* installments therein provided for but, on the contrary, confines liability to each installment as it falls due *and each year's payment is for the consideration actually furnished that year,* no violence is done to the constitutional provision. [Citations.] If, however, the instrument creates a full and complete liability upon its execution, or if its designation as a "lease" is a subterfuge and it is actually a conditional sales contract in which the "rentals" are installment payments on the purchase price for the aggregate of which an immediate and present indebtedness or liability exceeding the constitutional limitation arises against the public entity, the contract is void. [Citations.]' " (*Dean, supra,* 35 Cal.2d at pp. 446-447, quoting *Offner, supra,* 19 Cal.2d at p. 486, italics added.) We held that the state's agreement with Pacific-Southwestern Company was a true lease, not a "subterfuge"; that is, it created no immediate indebtedness for the total amount of all the rent payments, and each rental payment was to be exchanged for contemporaneously received consideration. We considered it insignificant, for purposes of our analysis, that title in the land and the office building vested in the state at the end of the lease term without any additional payment. (*Id.* at pp. 447-448.)

Justice Edmonds's dissent argued, as do plaintiffs here, that we should look to the substance of the transaction, rather than its form. He asserted that the "lease" of the office building was, in substance, a thinly disguised installment purchase contract. (*Dean, supra,* 35 Cal.2d 444, 450 (dis. opn. of

Edmonds, J.).) We rejected that argument. Our holding is easily understood if we recognize that the constitutional debt limitations do not arbitrarily telescope multiyear agreements into a single year. The determinative inquiry for purposes of the Constitution is not the extent to which the agreement resembles an installment purchase contract, but whether the payments in future years are contingent. Even if the parties in *Dean* had expressly labeled their agreement an "installment purchase contract," the agreement would have satisfied the Constitution so long as liability for each installment of the purchase price was contingent on receipt of some additional, contemporaneous consideration, such as the buyer's ongoing " 'use and occupancy of the . . . building[]' " before transfer of title. (*Id.* at p. 445; see also *County of Los Angeles* v. *Byram, supra,* 36 Cal.2d at p. 700 [applying *Dean*].)

Here, the City's payment of a rent that equals the Financing Authority's obligations under the bonds plus its administrative expenses does not substantively differ from the state's rent payments at issue in *Dean*. In *Dean, supra,* 35 Cal.2d at page 445, the Pacific-Southwestern Company no doubt intended to use the rent of $3,325 per month to pay capital costs (i.e., debt service) as well as administrative expenses. Here, by creating the Financing Authority instead of contracting with a private party, the City will avoid paying the additional amount that a private party would likely factor into the rent to assure a profit.

Moreover, here, as in *Dean, supra,* 35 Cal.2d at pages 447-448, the rent payments will be exchanged for contemporaneously received consideration. Specifically, the lease expressly provides that each rent payment will be made "in consideration of the right of the use and possession of, and the continued quiet use and enjoyment of, the Leased Property." As already noted, if the City somehow loses use of the Convention Center, its obligation to pay rent will abate. In addition, the Financing Authority has waived any right to accelerated payment of rents in the event the City breaches the agreement. In sum, the City will incur no obligation to make an individual rent payment until it receives the consideration corresponding to that payment.

Finally, as in *Dean, supra,* 35 Cal.2d at pages 447-448, it is irrelevant that, at the end of the lease term, the Financing Authority will relinquish title in the expanded Convention Center with no additional payment. That fact did not convert the lease in *Dean* to a debt requiring voter approval, and it does not do so here.

In sum, the City's obligation to pay rent to the Financing Authority does not constitute a debt requiring voter approval under the state Constitution.

Furthermore, we see no reason to construe the voter approval requirement in the City's charter more restrictively. Accordingly, the City's use of a lease agreement with the Financing Authority to achieve what it could not accomplish by itself does not violate the California Constitution or the City's charter.

> 2) *The Act does not require the Financing Authority, when issuing bonds, to comply with the debt limitation provisions that apply to the City.*

 Plaintiffs argue that the Act requires the Financing Authority, when issuing bonds, to comply with restrictions that apply to the City, including the two-thirds vote requirement.

The Port District and the City created the Financing Authority under the Act (Gov. Code, § 6500 et seq.). Originally, the Act merely authorized counties and municipalities to do jointly anything they each could do separately. (Stats. 1921, ch. 363, § 1, p. 542.) In *The City of Oakland* v. *Williams* (1940) 15 Cal.2d 542, 549 [103 P.2d 168], we held that the Act "grants no new powers but merely sets up a new procedure for the exercise of existing powers." In 1947, however, the Legislature added a section to the Act that allowed "contracting parties"—that is, the local governmental entities that enter into a joint powers agreement—to create a separate board or commission (a joint powers agency) to exercise on their behalf powers they hold in common. The section also provided that the agency administering the agreement—whether one of the contracting parties or a separate joint powers agency—need not comply with all the possibly conflicting procedural restrictions that apply to the various contracting parties. Rather, the agency need only comply with the procedural restrictions that apply to one of the contracting parties. (Stats. 1947, ch. 1045, § 3, p. 2447.) This principle now appears in Government Code section 6509 (section 6509), which provides that the "common power" (Gov. Code, § 6508) specified in the joint powers agreement "is subject to the restrictions upon the manner of exercising the power of one of the contracting parties, which party shall be designated by the agreement."

At the same time, the Legislature amended the Act to authorize certain joint powers agencies to issue bonds: "Any agency, commission or board . . . having the power of . . . operating an exhibition building or other place for holding fairs . . . or of : . . operating a . . . building or other place for holding athletic contests . . . shall have the power . . . to issue revenue bonds . . . . Such powers shall be *in addition to the powers common to the several parties* to the joint powers contract, but shall not be exercised until

authorized by the several parties to that contract." (Stats. 1947, ch. 1044, § 1, p. 2445, italics added.) With some modification, this provision is now included in article 2 of the Act. (Gov. Code, §§ 6546, 6547.) Among other things, the Legislature has amended the Act to broaden significantly the list of projects that a joint powers agency may fund with bonds. For example, the Act now permits a joint powers agency to "issue revenue bonds . . . to pay the cost and expenses of acquiring or constructing . . . [¶] . . . [¶] (c) Any . . . public buildings . . . ." (Gov. Code, § 6546, subd. (c).) The specific language granting joint powers agencies independent authority to issue bonds now appears in Government Code section 6547, which provides in pertinent part: "The power of the entity to issue revenue bonds is *additional to the powers common to the parties* to the joint powers agreement . . . ." (Italics added.)

Government Code section 6547 makes clear that the power of a joint powers agency to issue bonds under article 2 of the Act does not derive from any power of the contracting parties to issue bonds; rather, it derives from state law. Moreover, a joint powers agency holds this power independently of the contracting parties. In this regard, the term "joint powers agency" is somewhat misleading because, when issuing bonds under article 2 of the Act, the agency exercises its own power, not the joint powers of the contracting parties.

Because the agency, when issuing bonds under article 2 of the Act, does not exercise a power derived from the contracting parties, but rather a power it holds independently under state law, it is not subject to any of the restrictions that would apply to the contracting parties. In place of those restrictions, article 2 of the Act itself closely regulates the issuance of bonds. (See, e.g., Gov. Code, §§ 6546 [purposes for which agency may issue bonds], 6547 [requirement of authorization by ordinance subject to referendum], 6553-6569 [content of indenture], 6571 [manner of sale, application of proceeds], 6573 [use of revenues].)

In 1985, the Legislature added article 4 to the Act, broadening even further the authority of a joint powers agency to issue bonds. Article 4 of the Act provides that a joint powers agency can, "[i]n addition to other powers specified in an agreement . . . [¶] . . . [¶] (c) [i]ssue bonds . . . to pay the cost of any public capital improvement." (Gov. Code, § 6588, subd. (c), italics added; see Stats. 1985, ch. 868, § 6, pp. 2755-2756.) Article 4 of the Act also removes certain obstacles to bond "pooling," thus allowing local governmental entities to reduce capital costs by consolidating many individual bond issues into one common issue. But article 4 of the Act specifically contemplates the use of joint powers agencies to finance public works

projects on behalf of a contracting party even when bond pooling is not involved. For example, it authorizes a joint powers agency (1) to issue bonds "to finance a single public capital improvement . . . for a single local agency" (Gov. Code, § 6591, subd. (b)); (2) to "[l]ease the . . . improvement[] . . . to a local agency" (Gov. Code, § 6588, subd. (n)); and (3) "upon payment of all the indebtedness . . . . [to] convey any or all of the project to the lessee or lessees" (Gov. Code, § 6588, subd. (n); see also Gov. Code, § 6597.5).

In 1989, the Legislature amended article 4 of the Act to state that it "shall be deemed to provide a complete and *supplemental* method for exercising the powers authorized by this article, and shall be deemed as being *supplemental* to the powers conferred by other applicable laws. *The issuance of bonds, financing, or refinancing under this article need not comply with the requirements of any other state laws applicable to the issuance of bonds, including, but not limited to, other articles of this chapter.*" (Gov. Code, § 6587, italics added.) The Legislature could hardly have made clearer that a joint powers agency can issue bonds under article 4 of the Act without complying with the procedural restrictions found elsewhere in state law. In place of these restrictions, article 4, like article 2, closely regulates the issuance of bonds. (See, e.g., Gov. Code, §§ 6591 [purposes and terms of bonds, manner of sale], 6592 [content of resolution authorizing bonds], 6595 [terms of trust agreements], 6595.3 [additional purposes].)

Plaintiffs argue that section 6509 requires the Financing Authority to comply with the two-thirds vote requirement that applies when the City issues bonds. As noted, section 6509 provides that the power specified in a joint powers agreement "is subject to the restrictions upon the manner of exercising the power of one of the contracting parties, which party shall be designated by the agreement." Here, the joint powers agreement designates the City as that party.

However, section 6509, by its terms, applies only to the exercise of "[s]uch power" (italics added), which refers to the "common power" described in Government Code section 6508; that is, a power held in common by the parties that created the joint powers agency and derived from those parties. Section 6509, therefore, does not apply when a joint powers agency exercises a power it holds independently of the contracting parties. The joint powers agreement in this case reflects this distinction. It provides that "[t]he [Financing] Authority shall have the power *common* to the City and the [Port] District . . . . *Such* power shall be exercised in the manner provided in the Act, and . . . subject only to such restrictions upon the manner of exercising such powers as are imposed upon the City in the exercise of

similar powers. [¶] The Authority may *also* issue revenue bonds pursuant to the Act . . . ." (Italics added.) By stating that the Financing Authority may "also" issue bonds—that is, in addition to exercising the "power common to the City and the [Port] District"—and then by expressly referencing the Act, the joint powers agreement makes clear that the Financing Authority's power to issue bonds is derivative of state law, not the contracting parties. Moreover, the requirement in the agreement that the Financing Authority comply with "restrictions . . . imposed upon the City" expressly applies only to the exercise of "power common to the City and the [Port] District"— that is, powers derived from the contracting parties, not powers held independently.

Plaintiffs describe the legislative history of the Act in great detail, attempting to show that the Legislature, by enacting a series of amendments expanding the authority of joint powers agencies to issue bonds, did not intend to abrogate the requirement of section 6509. Plaintiffs' argument misses the point. When contracting parties delegate certain common powers to the joint powers agency, section 6509 requires the agency to exercise those powers in compliance with the restrictions applicable to at least one of the contracting parties. But when the agency exercises a power that it holds independently, section 6509 simply does not apply. This limitation was built into the express language of section 6509 from the outset and does not depend on the various amendments expanding the authority of joint powers agencies to issue bonds.

The power to issue bonds under articles 2 and 4 of the Act is a power a joint powers agency holds independently. For example, article 2 states that the power to issue bonds "is additional to the powers common to the parties to the joint powers agreement." (Gov. Code, § 6547.) Similarly, article 4 provides that the power to issue bonds is "[i]n addition to other powers specified in [the] agreement." (Gov. Code, § 6588, subd. (c).) Because the power to issue bonds is not a "common power" derived from the contracting parties, but an additional power that state law confers directly on joint powers agencies, section 6509 is expressly inapplicable.

When a statute is unambiguous, it "is to be applied according to its terms without further judicial construction. [Citation.]" (*Morse* v. *Municipal Court* (1974) 13 Cal.3d 149, 156 [118 Cal.Rptr. 14, 529 P.2d 46]; see also *Nickelsberg* v. *Workers' Comp. Appeals Bd.* (1991) 54 Cal.3d 288, 294 [285 Cal.Rptr. 86, 814 P.2d 1328].) Because section 6509 is unambiguous, the legislative history on which plaintiffs rely is irrelevant. Moreover, even if we were to adopt plaintiffs' argument that section 6509 is, by its own terms, somehow applicable to the issuance of bonds under articles 2 and 4,

then the express exemption in article 4 would come into play. Article 4 provides that a joint powers agency "need not comply with the requirements of any other state laws applicable to the issuance of bonds, including, but not limited to, other articles of this chapter." (Gov. Code, § 6587.) Put simply, section 6509 either is applicable to the issuance of bonds, or it is not. If it is applicable, then article 4 creates an express exemption.

In sum, when the Financing Authority issues bonds, it does so independently of any common powers delegated in the joint powers agreement, and therefore it is not subject to the limitations that would apply to the City, including the two-thirds vote requirements in the Constitution and the City's charter.

3) *The Act does not violate the "home rule" doctrine by allowing the Financing Authority to issue bonds without complying with the two-thirds vote requirement of the City's charter.*

▆▆ Plaintiffs argue that articles 2 and 4 of the Act conflict with the City's charter because, in effect, they allow the City to issue bonds without complying with the charter's two-thirds vote requirement. From this premise, plaintiffs then argue that the Act is in essence a "Charter Avoidance Act" that violates the Constitution's "home rule" provision. Plaintiffs reason that the charter's restrictions on municipal indebtedness are a "municipal affair," not a "statewide concern," and therefore that state law cannot authorize the City to do what the charter prohibits.

Article XI, section 5, subdivision (a), of the state Constitution establishes the "home rule" power of charter cities, stating in part: "It shall be competent in any city charter to provide that the city governed thereunder may make and enforce all ordinances and regulations in respect to municipal affairs, subject only to restrictions and limitations provided in their several charters and in respect to other matters they shall be subject to general laws." In *Johnson* v. *Bradley* (1992) 4 Cal.4th 389 [14 Cal.Rptr.2d 470, 841 P.2d 990], we described the analytical framework for resolving conflicts between state law and the legislative enactments of charter cities. ▆▆ We emphasized that, as a threshold matter, " 'a court asked to resolve a putative conflict between a state statute and a charter city measure initially *must satisfy itself that the case presents an actual conflict between the two.* If it does not, a choice between the conclusions "municipal affair" and "statewide concern" is not required.' [Citation.]" (*Id.* at pp. 398-399, quoting *California Fed. Savings & Loan Assn.* v. *City of Los Angeles* (1991) 54 Cal.3d 1, 16 [283 Cal.Rptr. 569, 812 P.2d 916], italics added.)

▆▆ This case does not involve an "actual conflict" with state law, and therefore we need not consider the extent to which municipal indebtedness is

a matter of "statewide concern." The City's charter regulates the manner in which *the City* may incur certain indebtedness. In this case, the City is incurring no indebtedness; rather, the Financing Authority is incurring indebtedness. As we already have noted, the Financing Authority is a separate legal entity from the City (Gov. Code, § 6503.5), and the Financing Authority's debts are not the City's debts (Gov. Code, §§ 6508.1, 6551). On the other hand, articles 2 and 4 of the Act authorize *joint powers agencies*, including the Financing Authority, to issue bonds. Articles 2 and 4 do not authorize cities to issue bonds. Therefore, the two-thirds vote requirement in the City's charter does not conflict with articles 2 and 4 of the Act because the former applies to the City, while the latter applies to the Financing Authority.

Plaintiffs once again urge us to look at the substance of the transaction at issue here, not its form. They argue that, in substance, *the City* is issuing the bonds and *the City* will make payments on the bonds. We agree that the City and the Port District are the motivating forces behind the transaction here, but we do not agree that in substance the City is issuing the bonds. Here, as in many complex financial transactions, the form of the transaction is critical. In both form and substance, the Financing Authority is issuing the bonds, and the City is paying rent. As we discussed in detail above, the City's obligation to pay rent is not an immediate liability for the aggregate of all rent payments, and it does not cause the Financing Authority's debt to become the City's debt.

We are not naive about the character of this transaction. If the City had issued bonds to pay for the Convention Center expansion, the two-thirds vote requirement would have applied. Here, the City and the Port District have created a financing mechanism that matches as closely as possible (in practical effect, if not in form) a City-financed project, but avoids the two-thirds vote requirement. Nevertheless, the law permits what the City and the Port District have done. Plaintiffs are correct that this conclusion allows local governments to burden taxpayers with potentially high costs that voters have not approved, but local governments impose similar burdens on taxpayers every time they enter into long-term leases involving property of substantial value. We have long held that the two-thirds vote requirement does not apply to these leases so long as the obligation to pay rent is contingent on continued use of the leased property. (*Dean, supra*, 35 Cal.2d at pp. 447-448; *Offner, supra*, 19 Cal.2d at p. 487; *Doland* v. *Clark, supra*, 143 Cal. at p. 181.)

## CONCLUSION

The requirements in the state Constitution and the City's charter that two-thirds of the electorate approve municipal indebtedness do not, by their

terms, apply to debts of the Financing Authority, and the City did not "incur . . . indebtedness" for purposes of these requirements by agreeing to make rent payments to the Financing Authority. In addition, the Act does not require the Financing Authority, when issuing bonds, to comply with the restrictions, such as the two-thirds vote requirement, that apply to the City. Finally, the Act does not in this regard violate the "home rule" provision of the California Constitution. Accordingly, we affirm the judgment of the Court of Appeal.

George, C. J., Mosk, J., Kennard, J., Baxter, J., Werdegar, J., and Brown, J., concurred.