TO BE PUBLISHED IN THE OFFICIAL REPORTS

OFFICE OF THE ATTORNEY GENERAL
State of California

DANIEL E. LUNGREN
Attorney General

_____

| | | |
|---|---|---|
| OPINION | : | |
| | : | No. 98-807 |
| of | : | |
| | : | November 18, 1998 |
| DANIEL E. LUNGREN | : | |
| Attorney General | : | |
| | : | |
| ANTHONY M. SUMMERS | : | |
| Deputy Attorney General | : | |
| | : | |

_____

THE HONORABLE WILLIAM A. CRAVEN, MEMBER OF THE CALIFORNIA STATE SENATE, has requested an opinion on the following questions:

With respect to the issuance of revenue bonds under Article 2 of the Joint Exercise of Powers Act:

1. Must the ordinance by which a party to a joint powers agreement authorizes the issuance of revenue bonds generally identify the projects to be funded and the revenue sources to be relied upon, or is it sufficient for the ordinance to refer to a list of potential projects and revenue sources?

2. Must each party to a joint powers agreement that will receive proceeds from particular revenue bonds adopt an authorizing ordinance prior to the sale of the bonds?

3. May the proceeds of the bond sale be used to finance projects not identified in the bond indenture?

4. May a joint powers agency use the bond revenues to finance loans to or purchase instruments of indebtedness from its members?

5. May a joint powers agency allow a public entity to become a "limited" or "associate" member of the agency without becoming a party to the agreement creating the agency?

CONCLUSIONS

With respect to the issuance of revenue bonds under Article 2 of the Joint Exercise of Powers Act:

1. The ordinance by which a party to a joint powers agreement authorizes the issuance of revenue bonds must generally identify the projects to be funded and the revenue sources to be

relied upon; it is not sufficient for the ordinance to refer to a list of potential projects and revenue sources.

      2.      Each party to a joint powers agreement that will receive proceeds from particular revenue bonds must adopt an authorizing ordinance prior to the sale of the bonds.

      3.      The proceeds of the bond sale may not be used to finance projects not identified in the bond indenture.

      4.      A joint powers agency may not use the bond revenues to finance loans to or purchase instruments of indebtedness from its members except for unfunded pension liabilities and delinquent property taxes and assessments.

      5.      A joint powers agency may not allow a public entity to become a "limited" or "associate" member of the agency without becoming a party to the agreement creating the agency.

ANALYSIS

Under the Joint Exercise of Powers Act (Gov. Code, §§ 6500-6599; ("Act"), **Footnote No. 1** two or more public entities may enter into an agreement to exercise jointly any power common to them (§ 6502; see 81Ops.Cal.Atty.Gen. 213 (1998)). The agreement may create a public agency that is separate and independent from the parties to the agreement, which agency is known as a joint powers agency. (§ 6503.5; *Rider* v. *City of San Diego* (1998) 18 Cal.4th 1035, 1050.)

The Legislature has given joint powers agencies the authority to issue revenue bonds under specified conditions. (§§ 6540-6579.5; "Article 2.") The power to issue bonds is not simply derivative of the powers of the member parties, but arises from the Act itself. (§§ 6546, 6547; *Rider* v. *City of San Diego*, *supra*, 18 Cal.4th at 1051.) Article 2 contains the laws applicable to the questions addressed in this opinion. However, these statutes are not the only laws dealing with the issuance of revenue bonds by joint powers agencies.

In 1985 the Legislature enacted the Marks-Roos Local Bond Pooling Act of 1985 (§§ 6584-6599; "Article 4"). Article 4 provides additional authority for the issuance of revenue bonds, but differs from the authority found in Article 2. Article 4 specifically authorizes joint powers agencies to "pool" bonds for various local infrastructure projects. (*Rider* v. *City of San Diego*, *supra*, 18 Cal.4th at 1051.)

While Article 2 and Article 4 do not act to limit each other (§ 6587; *Rider* v. *City of San Diego*, *supra*, 18 Cal.4th at 1052), we may look to Article 4 in interpreting Article 2 when the Article 2 statutes are not clear on their face. "It is 'a cardinal rule of statutory construction that statutes relating to the same subject matter are to be read together and reconciled whenever possible to avoid nullification of one statute by another.'" *(Brown* v. *West Covina Toyota* (1994) 26 Cal.App.4th 555, 565-566.) "[W]e interpret a statute in context, examining other legislation on the same subject, to determine the Legislature's probable intent. [Citations.]" (*California Teachers Assn.* v. *Governing Bd. Of Rialto Unified School Dist.* (1997) 14 Cal.4th 627, 642.)

      1.      Identification of Projects

The first question to be addressed is whether under Article 2 the ordinance authorizing the issuance of revenue bonds may merely refer to a list of potential projects and revenue sources rather than the actual projects and sources. We conclude that the ordinance must identify the actual projects and revenue sources.

Section 6547 provides in relevant part:

"The power of the entity to issue revenue bonds is additional to the powers common to the parties to the joint powers agreement, but shall not be exercised until authorized by the parties to that agreement. . . .

"Every local agency shall make any authorization, as permitted under the first sentence of this section, by ordinance, unless otherwise prescribed in this section. Except as provided in this section, the ordinance shall describe in general terms the project, or projects, to be funded by the revenue bonds, the maximum amount of the bonds proposed to be issued, and the anticipated sources of revenue to redeem the bonds. . . . Each such ordinance shall state that it is subject to the provisions for referendum prescribed by Section 9142 of the Elections Code."

In construing the terms of section 6547, we are to discern and effectuate the Legislature's intent. (See *Cal. Teachers Assn.* v. *Governing Bd. of Rialto Unified School Dist.*, *supra*, 14 Cal.4th at 632.) "To determine the intent of legislation, we first consult the words themselves, giving them their usual and ordinary meaning. [Citations.]" (*DaFonte* v. *Up-Right, Inc*. (1992) 2 Cal.4th 593, 601.)

Section 6547 requires an authorizing ordinance to "describe in general terms the project, or projects, to be funded." The plain meaning of these words requires the ordinance to specify the projects *to be* funded and to describe those projects in general terms. Reference to a list of potential projects that are under consideration by the members of a joint powers agency, with no specification of which of the projects the revenue bonds will finance, would not satisfy the statutory requirement, since it would not identify those projects *to be* funded but only a listing of projects which *might* be funded.

Moreover, we note that allowing reference merely to a list of potential projects would mean that members of a joint powers agency could establish a "blind bond pool" under Article 2, whereby the projects to be funded would not be identified at the time of the issuance of the bonds. While blind bond pools were authorized under Article 4 at one time, they were never authorized under Article 2 and have been virtually eliminated by a 1995 amendment of the Article 4 statutes. (See § 6591, subd. (g); Stats. 1995, ch. 229, § 8; Assem. Com. on Local Government, hearing (July 5, 1995) analysis of Sen. Bill No. 1275.)

Finally, we note that an ordinance authorizing a bond issue under Article 2 must be subject to a referendum, the power of the electorate to disapprove a legislative proposal. (§ 6547.) The Act contemplates the sale of bonds only for specific projects set forth in the authorizing ordinances so that the electorate may have an understanding of what would be at issue in exercising its referendum power. (See *Rider* v. *City of San Diego*, *supra*, 18 Cal.4th at 1051.)

We conclude in answer to the first question that under the terms of Article 2, the ordinance by which a party to a joint powers agreement authorizes the issuance of revenue bonds must generally identify the projects to be funded and the revenue sources to be relied upon; it is not sufficient for the ordinance to refer to a list of potential projects and revenue sources. **Footnote No. 2**

2.      Adopting Ordinances Prior to Sale

The second question presented is whether each party to a joint powers agreement receiving revenue bond proceeds must adopt an authorizing ordinance prior to the sale of the bonds. We conclude that prior authorization is required.

As indicated in response to the first question, an authorizing ordinance of an agency member must describe the actual projects and the sources of revenue for redemption of the bonds. (§ 6547.) However, not all agency members need adopt an authorizing ordinance. Section 6547.5 requires that only those agency members incurring financial obligations under issuance of the particular bonds must adopt an ordinance. Section 6547.5 states:

"A joint powers entity created pursuant to this chapter may issue revenue bonds pursuant to this article upon authorization by ordinance of only those individual parties to the joint powers agreement which contract to make payments to be applied to the payment of the revenue bonds, provided that the nonparticipating parties to the agreement incur no financial obligations under the issuance."

If an agency member contracts to make payments in redeeming particular revenue bonds, it must adopt an authorizing ordinance. May the ordinance be adopted after the bonds have been sold?

Both sections 6547 and 6547.5 require an authorizing ordinance to be adopted before issuance of the bonds. "The power of the entity to issue revenue bonds . . . shall not be exercised until authorized by the parties . . . ." (§ 6547.) "A joint powers entity created pursuant to this chapter may issue revenue bonds pursuant to this article upon authorization by ordinance . . . ." (§ 6547.5.)

It would be unreasonable to allow the sale of bonds that have not been authorized. We are to construe statutory language with "reason, practicality, and common sense." (*Halbert's Lumber, Inc.* v. *Lucky Stores, Inc.* (1992) 6 Cal.App. 1233, 1239.) "Statutes are to be given a reasonable and commonsense interpretation consistent with the apparent legislative purpose and intent 'and which, when applied, will result in wise policy rather than mischief or absurdity.' [Citation.]" (*Dyna-Med, Inc.* v. *Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1392.) Even if bonds could be sold prior to actual delivery and the term "issuance" were to be interpreted as such delivery (see, e.g., *Sunnyside Nurseries, Inc.* v. *Agricultural Labor Relations Bd.* (1979) 93 Cal.App.3d 922, 929), it would create obvious mischief to allow the sale of any bonds prior to their authorization.

We conclude in answer to the second question that under the provisions of Article 2, each party to a joint powers agreement that will receive proceeds from the revenue bonds must adopt an authorizing ordinance prior to the sale of the bonds.

3.      Amendment of the Bond Indenture

The third question concerns revenue bond indentures prepared under the terms of Article 2. May the proceeds of a bond sale under Article 2 be used to fund projects not identified in the indenture? We conclude that they may not.

An indenture constitutes the formal agreement between a group of bondholders and the debtor as to the terms of the debt. Section 6549 provides:

"An indenture providing the terms and conditions for the issuance of the bonds and the covenants relating thereto shall be adopted in or approved by resolution. Such indenture shall describe or state the revenues and funds from which the bonds shall be payable. Such funds or revenues shall include the revenues derived from the operation of the project or projects for which the bond proceeds are used or expended and any other revenues derived therefrom, and may also include revenue, including existing funds, of the entity derived from any other building or buildings, coliseum, stadium, facilities or other sources and any or all extensions or renewals thereof."

Section 6553 additionally states:

"The indenture authorizing the issuance of the bonds shall recite the objects and purposes for which the bonds are to be issued, which may include any or all of the purposes stated in this article and which shall comprise the project . . . ."

Other provisions of the indenture must describe the security for the bonds (§ 6550, subd. (b)), the maximum interest rates to be paid (§ 6553), the medium and place of payment (§ 6554), and other provisions to facilitate issuance of the bonds and to protect the security of the bondholders (§ 6555).

It is apparent that these statutory requisites cannot be met if the proceeds of the revenue bonds were used to fund projects not identified in the indenture. To use the funds for other purposes would impair the rights of the bondholders. The indenture is a contract with the holders of the bonds and may be enforced by appropriate judicial proceedings. (§ 6569.) Moreover, section 6572 provides for a lien upon the revenues of "the project described in the indenture authorizing issuance of the bonds" as security for repayment. If the bonds were used to finance a project not described in the indenture, no lien could attach and the rights of bondholders would be impaired.

We recognize that an indenture is subject to modification. Section 6562 states:

"The indenture may contain covenants or other provisions whereby the consent or agreement of a stated percentage or number of the holders of the bonds may bind all bondholders to modifications of or changes in all or part of the provisions of the indenture authorizing or providing for the issuance of such bonds, and the provisions subject to modification or change shall be specified or stated in such indenture."

Thus, if an indenture contains an appropriate authorization, it may be modified. However, an indenture prepared under the terms of Article 2 may not be changed so as to permit, for example, financing of a project of a public entity that was not a party to the joint powers agreement prior to the sale of the bonds. Such modification would violate the terms of sections 6547 and 6547.5, as described above, in requiring each joint powers agency member receiving bond revenues to adopt an authorizing ordinance prior to the sale of the bonds. Section 6562 must be construed in light of and consistent with the requirements of sections 6547 and 6547.5 and the other provisions of Article 2.

We conclude that the proceeds of the bond sale may not be used to finance projects not identified in the bond indenture.

4.      Use of Bond Proceeds

The fourth question concerns whether a joint powers agency may use bond revenues obtained under Article 2 to purchase debt instruments or finance loans to its members. We conclude that it may not do so except to cover the costs of unfunded pension liabilities and delinquent property taxes and assessments.

The governing statute is section 6546, which provides:

"In addition to other powers, any agency, commission, or board provided for by a joint powers agreement pursuant to Article 1 (commencing with Section 6500) may issue revenue bonds pursuant to this article to pay the cost and expenses of acquiring or constructing a project or conducting a program for any or all of the following purposes:

"(a) An exhibition building or other place for holding fairs or exhibitions for the display of agricultural, livestock, industrial, or other products, including movable equipment, entertainment facilities, and other facilities to be used in conjunction with holding a fair or exposition in several locations . . . .

"(b) A coliseum, a stadium, a sports arena or sports pavilion or other building for holding sports events, athletic contests, contests of skill, exhibitions, spectacles, and other public meetings

meetings.

"(c) Any other public buildings, including, but not limited to, general administrative facilities of a city, county, city and county, special district, or authority.

"(d) A regional or local public park, recreational area, or recreational center, and all facilities and improvements related thereto.

"(e) A facility for the generation or transmission of electrical energy for public or private uses and all rights, properties, and improvements necessary therefor, including fuel and water facilities and resources. As used in this chapter, 'transmission of electric energy' does not include the final distribution of electric energy to the consumer.

"(f) A facility for the disposal, treatment, or conversion to energy and reusable materials of solid or hazardous waste or toxic substances.

"(g) Facilities for the production, storage, transmission, or treatment of water or waste water.

"(h) Local streets, roads, and bridges.

"(i) Bridges and major thoroughfares construction pursuant to Sections 50029 and 66484.3.

"(j) Mass transit facilities or vehicles.

"(k) Publicly owned or operated commercial or general aviation airports and airport-related facilities.

"(*l*) Police or fire stations.

"(m) Public works facilities, including corporation yards.

"(n) Public health facilities owned or operated by a city, county, city and county, special district, or authority.

"(*o*) Criminal justice facilities, including court buildings, jails, juvenile halls, and juvenile detention facilities.

"(p) Public libraries.

"(q) Publicly owned or operated parking garages.

"(r) Low-income housing projects owned or operated by a city, county, city and county, or housing authority.

"(s) Public improvements authorized in a project area created pursuant to the Community Redevelopment Law . . . .

"(t) Public improvements authorized pursuant to the Improvement Act of 1911 . . . the Improvement Bond Act of 1915 . . . the Municipal Improvement Act of 1913 . . . and the Mello-Roos Community Facilities Act of 1982 . . . .

"(u) Telecommunication systems or service, including, but not limited to, the installation, provision, or maintenance of that system or service.

installation, provision, or maintenance of that system or service.

"(v) Programs, facilities, rights, properties, and improvements for the management, conservation, reuse, or recycling of electric capacity or energy, natural gas, water, waste water, or recycled water, including demand side or load management and other programs and facilities designed to reduce the demand for, or permit or promote the efficient use of, those resources.

"'Programs,' for the purpose of this subdivision, shall include activities only to the extent the costs thereof may be charged to a capital account under applicable generally accepted accounting principles or are of a type required to be charged to a capital account by entities subject to regulation by the Public Utilities Commission or other regulatory body of the state.

"(w) Equipment necessary to support the above-listed facilities or necessary to deliver public services therefrom, including, but not limited to, telecommunications equipment, computers, and service vehicles.

"Bonds may be issued pursuant to this article if the joint powers entity, or its individual parties which contract pursuant to Section 6547.5, 6547.6, or 6547.7 to make payments to be applied to the payment of the indebtedness, have the power to acquire, construct, maintain, or operate one or more of the projects specified in this section."

It can readily be seen that for purposes of Article 2, numerous specific projects may be financed by revenue bonds. All but subdivision (v) of section 6546 describe capital facilities. Subdivision (v) of the statute includes "programs," but only to the extent that the costs may be charged to a capital account. (See also § 6585, subd. (g).)

We reject the suggestion that the introductory paragraph of section 6546 authorizes the purchase of a joint powers agency member's debt instruments by allowing the financing of a "program" in addition to the financing of capital facilities. Section 6546 was amended in 1993 to add the words "or conducting a program" to the opening paragraph and at the same time to add subdivision (v) to the statute. (Stats. 1993, ch. 190, § 2.) The amendment was an urgency measure, justified as follows:

"In order to insure that joint power authorities are not forced by limitations in existing law to meet new demands for water and energy only through the development of new production facilities rather than conservation programs, it is necessary that this act take effect immediately." (Stats. 1993, ch. 190, § 3.)

It is apparent from the legislative history of the 1993 amendment of section 6546 that the change in the introductory paragraph and the addition of subdivision (v) of the statute were tied together. The committee reports refer to a statewide joint powers agency then being established to facilitate the financing of a number of energy and water conservation programs, such as "public information campaigns, to complement its conservation projects." (Sen. Com. on Local Government, hearing (June 30, 1993) analysis of Assem. Bill No. 1828.) Because of concerns over the issuance of revenue bonds to finance such non-capital programs, the bill was amended "to limit the authorized programs to those that must be charged to capital accounts pursuant to generally accepted accounting procedures or state regulations." (*Ibid.*)

Thus, the legislative history of section 6546 indicates that the use of the term "program" in the introductory paragraph was intended to apply specifically in the context of subdivision (v) of the statute, and then only when properly chargeable to a capital account. The 1993 amendment was not intended to constitute a general authorization to finance any and all programs carried out by agency members or to permit the financing of loans to agency members or to purchase their instruments of indebtedness. When the Legislature has authorized the latter activity, it has done so explicitly. (See, e.g., §§ 6516.6, 6591, subds. (b), (c).) In short, the 1993 amendment to section 6546 was a limited expansion of the purposes for which a joint

powers agency may issue revenue bonds, and not carte blanche to finance all programs undertaken by agency members. There must still be a project authorized by section 6546 and described in the authorizing ordinances.

Section 6516.6 provides the single exception to the funding of capital facilities specified in section 6546. It authorizes a loan to cover a member's unfunded pension liability or delinquent property taxes or assessments. Section 6516.1 states:

"Notwithstanding any other provision of law, a joint powers agency established pursuant to a joint powers agreement in accordance with this chapter may issue bonds pursuant to Article 2 (commencing with Section 6540) of this chapter or Article 4 (commencing with Section 6584) of this chapter, in order to purchase obligations of local agencies or make loans to local agencies, which moneys the local agencies are hereby authorized to borrow, to finance the local agencies' unfunded actuarial pension liability or to purchase, or to make loans to finance the purchase of delinquent assessments or taxes levied on the secured roll by the local agencies, the county, or any other political subdivision of the state. Notwithstanding any other provision of law, including Section 53854, the local agency obligations or loans, if any, shall be repaid in the time, manner and amounts, with interest, security, and other terms as agreed to be the local agency and the joint powers authority." **Footnote No. 3**

We conclude in answer to the fourth question that a joint powers agency may not use bond revenues obtained under Article 2 to finance loans to, or purchase instruments of indebtedness from, its members except for unfunded pension liabilities and delinquent property taxes and assessments.

5.	Associate or Limited Members

The final question to be addressed is whether a joint powers agency may be comprised of different classes of members, including "limited" or "associate" members that are not parties to the agreement creating the agency. We conclude that the Act does not recognize such different classes of membership.

The basic authority for public entities to jointly exercise powers under the Act is found in section 6502:

"If authorized by their legislative or other governing bodies, two or more public agencies by agreement may jointly exercise any power common to the contracting parties, even though one or more of the contracting agencies may be located outside this state.

"It shall not be necessary that any power common to the contracting parties be exercisable by each such contracting party with respect to the geographical area in which such power is to be jointly exercised. . . ."

As we have seen, section 6547.5 allows a joint powers agency to issue bonds upon the authorization of only those parties to the joint powers agreement who contract to make payments on the bonds.

The Act contains no authority for a joint powers agency, by contract or otherwise, to enlarge upon or waive the provisions of the Act. A member may only act jointly "by agreement." (§ 6502.) It cannot receive funding unless the requirements of the Act are met. The use of Article 2 revenue bonds to finance projects that have not been specifically approved by ordinance adopted by the authorizing parties is not permitted, nor is the funding of projects not described in the bond indenture. A public entity that was not a party to the issuance of revenue bonds under Article 2 may not have its projects financed from the proceeds of those bonds since it has not adopted an authorizing ordinance (giving the electorate the opportunity to exercise its power of referendum) prior to the sale of the bonds.

In answer to the final question, we conclude that a joint powers agency may not allow a public entity to become a "limited" or "associate" member without becoming a party to the agreement creating the agency.

\* \* \* \* \*

**Footnote No. 1**
All references to the Government Code hereafter will be by section number only.

**Footnote No. 2**
The court's decision in *The City of Oakland* v. *Williams* (1940) 15 Cal.2d 542 provides no support for the contrary conclusion. Among other considerations, *Williams* did not involve the issuance of revenue bonds and was decided prior to the enactment of section 6547. (See *Rider* v. *City of San Diego*, *supra*, 18 Cal.4th at 1050.)

**Footnote No. 3**
We also note that revenue bonds may be issued to "refund" outstanding bonds in order to take advantage of lower interest rates. (§ 6577; Stats. 1972, ch. 531, § 16.)