[No. A102148. First Dist., Div. Two. Apr. 14, 2004.]

HOWARD ZACK et al., Plaintiffs and Respondents, v.
MARIN EMERGENCY RADIO AUTHORITY, Defendant,
Cross-Complainant and Appellant.
TOWN OF TIBURON, Real Party in Interest, Cross-Defendant and
Respondent.

CITIZENS FOR OPEN PROCESS IN ANTENNA SITING et al., Plaintiffs
and Respondents, v.
MARIN EMERGENCY RADIO AUTHORITY, Defendant and Appellant.
TOWN OF TIBURON, Real Party in Interest.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for
publication with the exception of parts II and III.

## COUNSEL

Kerr & Wagstaffe, James M. Wagstaffe, Keith K. Fong; McCracken, Byers & Haesloop, David J. Byers and Patrick M. K. Richardson for Defendant, Cross-complainant and Appellant.

Sedgwick, Detert, Moran & Arnolds, Steven Roland, Randall Block, Kevin Hughey; Cassidy, Shimko & Dawson, Stephen K. Cassidy, Deborah L. Kartiganer; Bien & Summers and Elliot L. Bien for Plaintiffs and Respondents Howard Zack et al.

McQuaid Bedford & Van Zandt, J. Dennis McQuaid, Michael J. Van Zandt, Neil R. Bardack; Bien & Summers and Elliot L. Bien for Plaintiffs and Respondents COPAS and Pratt et al.

Ann R. Danforth for Real Party in Interest, Cross-Defendant and Respondent.

## OPINION

**KLINE, P. J.**—Marin Emergency Radio Authority (MERA), a "joint powers agency" (Gov. Code, § 6500 et seq.)[1] made up of 25 local public agencies situated in Marin County, including the County itself,[2] appeals from an order of the Marin County Superior Court granting petitions for peremptory writs of mandamus sought in consolidated actions by Citizens for Open Process in Antenna Siting (COPAS) and Russ and Joni Pratt (collectively, the Pratt plaintiffs), and Howard and Diane Zack (the Zack plaintiffs), and denying MERA's cross-petition against the Town of Tiburon, identified in both actions as the real party in interest.

The court barred MERA from placing a radio antenna in Tiburon without first complying with that town's land use ordinances and preparing a supplemental or subsequent environmental impact report (SEIR) pursuant to the California Environmental Quality Act (CEQA). (Pub. Resources Code, § 21000 et seq.)

As we conclude that MERA is not subject to local zoning law, that the circumstances of this case do not require preparation of an SEIR, and that plaintiffs' related claims are also without merit, we shall reverse the judgment.

### FACTS AND PROCEEDINGS BELOW

The Joint Powers Agreement entered into by MERA's members on February 28, 1998, recites that Marin County's public safety and emergency radio

---

[1] Unless otherwise indicated, all statutory references are to the Government Code.

[2] Originally, MERA had 26 members: Alto-Richardson Bay Fire Protection District, City of Belvedere, Bolinas Fire Protection District, Town of Corte Madera, Town of Fairfax, Inverness Public Utility District, Kentfield Fire Protection District, City of Larkspur, County of Marin, Marin County Transit District, Marin Municipal Water District, Marinwood Community Services District, City of Mill Valley, City of Novato, Novato Fire Protection District, Town of Ross, Ross Valley Fire Protection Agency, Town of San Anselmo, City of San Rafael, City of Sausalito, Stinson Beach Fire Protection District, Tamalpais Fire Protection District, Town of Tiburon, Tiburon Fire Protection District, Twin Cities Police Authority, and Marin Community College District. On July 1, 1999, the Alto-Richardson Bay Fire Protection District merged with the Tamalpais Fire Protection District to become the Southern Marin Fire Protection District.

system is "obsolete and not dependable" and that the purpose of the agreement "is to establish a public entity separate from the County, Special Districts, Cities and Towns, . . . [¶] . . . which will plan, finance, implement, manage, own and operate a multijurisdictional and county-wide Public Safety and Emergency Radio System with the attendant facilities."

It is undisputed that the public safety radio system serving fire, police and public works agencies in Marin County is outmoded and ineffective. Among other problems, the system relies on bandwidths that are increasingly unavailable, which often results in unintelligible communications due to multiple users attempting to simultaneously broadcast on a shared radio channel. As a result, police, fire and other public agencies are unable to communicate directly with one another rapidly, as is necessary to effectively respond to a natural disaster or other emergency situation. To solve the problem, MERA proposes to construct a network of microwave dishes, radio antennas and radio equipment located at 17 interlinked sites throughout the county.

One of the sites MERA selected is a 1.1-acre parcel located at 99 1/2 Mt. Tiburon Drive in the Town of Tiburon (the Mt. Tiburon site). The site, which is owned by the Marin Municipal Water District (MMWD), contains a water storage tank and pumping facility. It is also the location of existing telecommunications facilities: a Southern Marin Dispatch transmitter and an antenna mounted on top of the water tank. Until recently, a 20-foot-high cable television monopole and microwave dish were also located on the Mt. Tiburon site. Tiburon's General Plan designates this area a "Government Facility" and it is zoned for "Public/Quasi Public" land use. On three sides, the site is adjacent to a single-family residential development. The closest residential property line is about 10 feet from the western property line, on the other side of an open space easement.

MERA's engineering consultant specified installation on the Mt. Tiburon site of two microwave dishes mounted on support poles 13 and 20 feet in height and three two-way radio antennas mounted on a 60-foot high monopole on the same location as the previous cable television monopole.

On September 16, 1999, after completion of an initial study to determine whether an Environmental Impact Report (EIR) was necessary or a "negative declaration" would suffice (Cal. Code Regs., tit. 14, §§ 15000 et seq., 15365 (The CEQA Guidelines)), MERA decided to prepare an EIR. The next day, MERA issued a "Notice of Preparation" (NOP) identifying all 17 proposed antenna sites, including that at the Mt. Tiburon site, and invited "[p]ublic comments on the scope of the issues to be evaluated in the EIR." MERA sent the NOP to local governments and agencies and published it in the Marin Independent Journal, a countywide newspaper of general circulation. The

NOP requested interested parties to submit written comments by October 20, 1999. MERA received numerous responses, but none from plaintiffs or the Town of Tiburon.

On November 15, 1999, when the draft EIR (DEIR) was completed, MERA issued a Notice of Completion and Notice of Public Hearing. The notice identified the Mt. Tiburon site as a proposed antenna location, announced the availability of the DEIR, stated that a public hearing would be held on December 9, 1999, and declared that the 45-day public review period would conclude on December 29, 1999. Also on November 15, the Notice of Completion and Notice of Public Hearing were published in the Marin Independent Journal. On the same day, the Notice of Completion, Notice of Public Hearing and a copy of the DEIR were sent to MERA members, one of which was the Town of Tiburon.

Although several local agencies, organizations and individuals submitted written comments on the DEIR, and MERA heard public testimony at the hearing on December 9, 1999, neither plaintiffs nor the Town of Tiburon appeared at the hearing or objected to the DEIR.

The DEIR concluded that, with respect to visual changes, biological resources, and radio frequency exposure, the impact of the proposed use of the Mt. Tiburon site would be "less than significant." It also noted that although the site is close to single-family residential development on three sides, it is lower in elevation and dense tree growth "effectively screens the location from off-site views"; that design features were incorporated into the project to protect significant natural resources, including scenic views, in compliance with local land-use policies; and that the radio frequency exposure at ground level resulting from the proposed operation would be "negligible," and significantly less than that permitted by the Federal Communications Commission (FCC).

The DEIR also evaluated a site at 145 Sugarloaf Drive, also a water tank site owned by the MMWD, as an alternative to the Mt. Tiburon site. "After comparing the predicted site coverage area, microwave path, visibility, impact on surrounding neighborhoods and cost," the DEIR concluded that "the Mt. Tiburon Tank site was a better system choice for the proposed project and achieved the same or better project performance goals than the Sugarloaf site."

On February 3, 2000, MERA issued a Notice of Public Meeting for consideration of the Final EIR (FEIR), providing the same notice as that given in connection with the DEIR. Again, neither plaintiffs nor the Town of Tiburon appeared at the hearing or submitted written comments. On February

24, 2000, MERA's Board adopted a resolution certifying the FEIR as complete and implementing a "Mitigation Monitoring and Reporting Program." Nineteen of MERA's 25 members voted in favor of the resolution, one voted no, and five, including the Town of Tiburon, were absent. The next day, MERA issued a Notice of Determination approving the "Marin Public Safety and Emergency Communication System" project. No action or proceeding challenging the project on the ground of noncompliance with CEQA was commenced within the applicable 30-day limitation period. (Pub. Resources Code, § 21167, subd. (c).)

On April 7, 2000, MERA applied to the Town of Tiburon for a conditional use permit and for design review. The 12-page Staff Report of the Tiburon Planning Commission concluded that MERA's application appeared to "substantially meet the Interim Standards and Criteria adopted by the Town." As material, the report stated as follows: "The proposed location utilizes a publicly used site and contains an existing water tank structure. The antenna panels and equipment cabinets have been sited and finished in colors and materials to generally blend in with the surrounding area. Noise and traffic generated by the facility appear to be minimal. The proposed facility would be visible from certain residences, and from the adjacent Tiburon Ridge Trail, but would not significantly impact the primary views of any homes or from the Tiburon Ridge Trail. The proposed project would be an integral part of a critical emergency radio system that would benefit Marin County and the entire Tiburon Peninsula in times of emergency." Noting that some owners of neighboring residential properties objected to the project due to "health concerns" and urged that it be relocated to an open space area, the Staff Report responded that the proposed project complied with FCC health standards and the Planning Commission therefore could not consider health concerns absent substantial evidence to the contrary, and that the Tiburon Zoning Ordinance prohibits new structures on open space lands.

Despite the favorable report of its staff, the Tiburon Planning Commission denied MERA's application for a conditional use permit on June 28, 2000. The Commission found that (1) the proposed project would be inconsistent with provisions of the Tiburon Zoning Ordinance requiring that the use be " 'properly related to the development of the neighborhood as a whole' " and " 'reasonably compatible with the types and uses normally permitted in the surrounding area' "; (2) the project "would be inconsistent with Goal LU-B of the Land Use Element of the Tiburon General Plan, which directs the Town 'to ensure that all land uses, by type, amount, design, and arrangement, serve to protect and enhance the low-density residential and village character and image of the community' "; and (3) the project "would be inconsistent with Section IV.A. of the Town's Interim Standards and Criteria for Wireless Communications Facilities, which states that 'applications for new wireless communications facilities should avoid sites located within or near residential

areas' " and which also require the applicant for a permit for a wireless communication facility to submit an alternate site plan, which may include the "potential use of appropriate open space locations."

MERA never rescinded the FEIR, but during the next year it studied 17 potential alternatives to the Mt. Tiburon site, including some not previously considered and rejected. Finally, on May 13, 2002, after concluding there was no feasible alternative site, MERA proceeded to condemn the Mt. Tiburon site by enacting three resolutions. The first declared that the public interest and necessity require acquisition of the Mt. Tiburon site and directed the filing of eminent domain proceedings; the second overrode the resolution of the Tiburon Planning Commission denying MERA a conditional use permit; and the third found that environmental review of the Mt. Tiburon site required by CEQA had been completed and "additional environmental review is not required because the physical conditions at the Mt. Tiburon site have not changed since MERA's February 24, 2000, certification of the FEIR, and MERA has not altered its plans for the use of the site."

On May 15, 2002, the Mt. Tiburon site was condemned pursuant to a final order of the Marin County Superior Court. MMWD, the owner of the site and a member of MERA, did not oppose condemnation.

On July 31, 2002, when it knew MERA was preparing to physically develop the Mt. Tiburon site, the Tiburon Town Council initiated and adopted a resolution approving the location of a "Southern Marin Emergency Radio Facility" on the Sugarloaf site that had been rejected in the FEIR. The resolution exempted the project from all provisions of the Tiburon Zoning Ordinance and found that, as conditioned by the Town, placement at the Sugarloaf site would be consistent with the Tiburon General Plan. The resolution found that "a subsequent or supplemental EIR is not appropriate for this project," primarily because use of the Sugarloaf site instead of the Mt. Tiburon site "does not involve new significant environmental effects, not discussed in the MERA EIR, or a substantial increase in severity of previously identified significant effects."

On August 1, 2002, the day after passage of the Town Council's resolution, a group of Tiburon residents opposed to the use of the Sugarloaf site— Tiburon Residents Against Unfair MERA Antenna Siting, or TRAUMAS— commenced an action in the Marin County Superior Court (*TRAUMAS v. Town Council of Tiburon* (Superior Ct. Marin County, 2002, No. CV023926)) seeking mandamus commanding the Council to set aside its approval of the Sugarloaf site. The superior court granted such relief on October 2, 2002, ruling that the "Town committed a prejudicial abuse of discretion in its failure to require a supplemental or subsequent EIR before approving the Sugarloaf

location." The Town of Tiburon did not appeal and the propriety of the ruling in that case is not before us.

When contractors engaged by MERA arrived at the Mt. Tiburon site on September 13, 2002, to commence construction of the project, they found a "Stop Work" notice had been placed on the site that day by the Tiburon Building Department. Confronted by Tiburon Police Officers, the construction team left the site.

On September 30, 2002, the Pratt plaintiffs filed a petition for writ of mandamus (Code Civ. Proc., §§ 1085, 1094.5), asking the court to direct MERA to vacate and set aside its actions of May 13, 2002, recertifying the FEIR for the Mt. Tiburon site, overriding the Town of Tiburon's denial of a conditional use permit, and determining that a subsequent or supplemental EIR was unnecessary. The Town of Tiburon was identified as the real party in interest. A similar action had been filed by the Zack plaintiffs on September 27, 2002, although they also sought declaratory and injunctive relief, and alleged public and private nuisance. On October 28, 2002, MERA filed a cross-petition for writ of mandate in the latter action. On November 1, 2002, the two actions were consolidated.

On January 27, 2003, the court issued a tentative ruling and proposed order granting plaintiffs the mandamus relief they sought. The court heard oral argument the next day, and adopted the tentative ruling and order on January 30, 2003. The trial court found that (1) MERA's condemnation of the Mt. Tiburon site was subject to and failed to comply with Tiburon's zoning ordinance and general plan, and (2) the availability of new information regarding the feasibility of alternate sites required MERA to prepare and circulate an SEIR concerning its proposed use of the Mt. Tiburon site.

## DISCUSSION

### I.

### MERA is Not Subject to Tiburon's Land Use Regulations

The determination that MERA is subject to local land use regulations was based solely on the trial court's interpretation of provisions of the Joint Exercise of Powers Act. (§ 6500 et seq. (the Act).) "The interpretation of statutes and ordinances 'is ultimately a judicial function.' " (*MHC Operating Limited Partnership v. City of San Jose* (2003) 106 Cal.App.4th 204, 219 [130 Cal.Rptr.2d 564], quoting *Carson Harbor Village, Ltd. v. City of Carson Mobilehome Park Rental Review Bd.* (1999) 70 Cal.App.4th 281, 290 [82 Cal.Rptr.2d 569].) As the issues resolved · by the trial court present

pure questions of law, our review is independent; we are not bound by the conclusions of the trial court. (*Rosenblit v. Superior Court* (1991) 231 Cal.App.3d 1434, 1442–1444 [282 Cal.Rptr. 819].)

"Originally, the Act merely authorized counties and municipalities to do jointly anything they each could do separately. [Citation.] . . . In 1947, however, the Legislature added a section to the Act that allowed 'contracting parties'—that is, the local governmental entities that enter into a joint powers agreement—to create a separate board or commission (a joint powers agency) to exercise on their behalf powers they hold in common. The section also provided that the agency administering the agreement—whether one of the contracting parties or a separate joint powers agency—need not comply with all the possibly conflicting procedural restrictions that apply to the various contracting parties. Rather, the agency need only comply with the procedural restrictions that apply to one of the contracting parties. [Citation.] This principle now appears in Government Code section 6509 (section 6509), which provides that the 'common power' (Gov. Code, § 6508) specified in the joint powers agreement 'is subject to the restrictions upon the manner of exercising the power of one of the contracting parties, which party shall be designated by the agreement.' " (*Rider v. City of San Diego* (1998) 18 Cal.4th 1035, 1050 [77 Cal.Rptr.2d 189, 959 P.2d 347]; see also *The City of Oakland v. Williams* (1940) 15 Cal.2d 542 [103 P.2d 168].)

■ The contracting party designated by the joint powers agreement creating MERA to be its "section 6509 agency" is the County of Marin. While "local agencies" are subject to "all applicable building ordinances and zoning ordinances of the county or city in which the territory of the local agency is situated" (§ 53091, subd. (a)), cities and counties are explicitly excluded from the statutory definition of a "local agency" (§ 53090, subd. (a)), and therefore exempt from each other's building and zoning ordinances when acting within their own territory. (*Lawler v. City of Redding* (1992) 7 Cal.App.4th 778, 783 [9 Cal.Rptr.2d 392].) Relying on *Cooper v. Mountains Recreation & Conservation Authority* (1998) 61 Cal.App.4th 1115, 1118 [71 Cal.Rptr.2d 858], MERA argued that, because the County of Marin is exempt from the building and zoning ordinances of the Town of Tiburon, which is in Marin County, MERA is similarly exempt, and it is entirely beside the point that other members of MERA, acting individually, would not be exempt because they are "local agencies."

The trial court rejected this argument. Acknowledging that under section 6509 MERA was subject only to those restrictions applicable to the County, and that the County was exempt from Tiburon's land use regulations, the court found section 6509 inapplicable. The court reasoned that section 6509 applies only to exercises of power that arise from the "common powers" of

the parties to the joint powers agreement, and that MERA's power to construct and operate an emergency communications system instead arises under section 6546 of the Act. The court additionally concluded that the power MERA sought to exercise was not a "common power" because four of MERA's members lacked the power to construct and operate an emergency communications system. As we shall explain, these determinations were erroneous.

A. *MERA's Power to Construct and Operate an Emergency Communications System Does Not Arise Under Section 6546*

Section 6546 of the Act authorizes joint powers agencies to issue bonds for the purpose of paying "the cost and expenses of acquiring or constructing a project or conducting a program" for, among numerous other purposes, "[t]elecommunication systems or service, including, but not limited to, the installation, provision, or maintenance of that system or service." (§ 6546, subd. (u).) The trial court reasoned that the "the power to actually install, provide and maintain [telecommunications] systems is implicit in the power to raise funds for those purposes. In other words, it would not make sense for a joint powers authority to raise money for construction of a facility if it could not then construct the facility." Based on its determination that the power to construct and operate facilities financed through the issuance of bonds derived from section 6546, not from the "common powers" of MERA's members, the court concluded that section 6509 did not apply and MERA must therefore comply with Tiburon's land use regulations.

■ The trial court unjustifiably inflated the limited purpose of section 6546, which does no more than authorize a joint powers agency to issue revenue bonds to finance public projects for specified purposes. The statute makes clear that it confers the power to issue bonds only "if the joint powers entity, or its individual parties . . . *have* the power to acquire, construct, maintain, or operate one or more of the projects specified in this section." (§ 6546, italics added.) The power to construct and operate the project or program sought to be financed through the issuance of bonds must, in other words, already exist. It seems to us fanciful to think that, because section 6546 authorizes joint powers agencies to issue bonds to finance "streets, roads, and bridges," "mass transit facilities," "police or fire stations," and "criminal justice facilities" (§ 6546, subds. (h), (j), (l), (*o*)), it *also* confers on such agencies the power to actually construct and operate such public facilities. The Act does not confer on a joint powers agency the power to administer a "criminal justice system" simply because it authorizes such an agency to issue bonds for the construction of "court buildings, jails, juvenile halls, and juvenile detention facilities." (§ 6546, subd. (*o*).) The power to administer a criminal justice system is *the precondition, not the result*, of the

power to issue bonds for the purpose of constructing and administering a "criminal justice system." So, too, is the power to construct and operate a "[t]elecommunication system[] or service" (§ 6546, subd. (u)) the precondition of the statutory power to issue bonds for that purpose.

■ *Rider v. City of San Diego, supra*, 18 Cal.4th 1035, the only case interpreting section 6546, is not entirely on point but does indicate that the power to issue bonds conferred by that statute is independent of other powers a joint powers agency may possess. *Rider* involved a challenge to the validity of a plan to expand a city's convention center. The expansion was to be financed through the issuance of bonds by a joint powers agency, known as the "Financing Authority," consisting of the city and the port district. The plaintiffs argued that the Act required the Financing Authority to comply with restrictions that apply to the city, which was the party designated by the joint powers agreement, including a two-thirds vote requirement from which the city was not exempt. The Supreme Court disagreed. Among other things, the court pointed out that the power to issue revenue bonds conferred on joint powers agencies by section 6546 is " '*additional to the powers common to the parties to the joint powers agreement* . . . .' " (*Rider,* at p. 1051, quoting § 6547, some italics added.) "Government Code section 6547 makes clear that the power of a joint powers agency to issue bonds under article 2 of the Act does not derive from any power of the contracting parties to issue bonds; rather, it derives from state law. Moreover, a joint powers agency holds this power independently of the contracting parties. In this regard the term 'joint powers agency' is somewhat misleading because, *when issuing bonds under article 2 of the Act*, the agency exercises its own power, not the joint powers of the contracting parties." (*Rider,* at p. 1051, italics added.) ■ Article 2 of the Act, which includes section 6546, does not regulate any power of a joint powers agency unrelated to exercise of the power to issue bonds. It is unreasonable to think the mere reference in that article to powers other than the power to issue bonds has the effect of conferring such other powers on an agency that would not otherwise enjoy them.

Having determined that MERA's power to construct and operate an emergency communications system does not derive from section 6546, we turn to the question whether it derives from a "common power" of the parties to the joint powers agreement, as MERA contends.

B. *MERA's Power to Construct and Operate an Emergency Communications System is Common to the Parties to the Joint Powers Agreement*

Conceding that MERA's members each had the power to acquire land for public use, the court emphasized that they could do so *only for uses related to*

*their missions*, and constructing and maintaining an emergency communications system was not part of the mission of *all* of MERA's members, as would be necessary to create a "common power." Thus, for example, the court acknowledged that MMWD is authorized to "take any property necessary to carry out the business of the district" (Wat. Code, § 31040), and to construct facilities "useful or necessary to convey, supply, store, or otherwise make use of water" for any authorized purpose (Wat. Code, § 31042). The court determined, however, that the construction and operation of an emergency communications system is not "necessary to carry out the business of [MMWD]" and does not "make use of water," and reasoned that MMWD therefore has no power to acquire property for the site of an emergency communications system.

The trial court found that not just MMWD, but also three other members of MERA—the Marin County Transit District, the Marinwood Community Services District, and the Marin Community College District—lacked authority to construct and operate an emergency communications system. Accordingly, the court concluded that MERA lacked the "common power" to take this action and was therefore not entitled to the benefit of section 6509, but rather subject to local land use requirements.

■ Significantly, the foregoing theory was not advanced by plaintiffs, but raised sua sponte by the court.[3] Ignoring the principle that the action of a respondent in a mandamus proceeding is presumed to be legally authorized and otherwise correct (*California Teachers Assn. v. Ingwerson* (1996) 46 Cal.App.4th 860, 865 [53 Cal.Rptr.2d 917]; see also *Beckwith v. County of Stanislaus* (1959) 175 Cal.App.2d 40, 44–45 [345 P.2d 363] ["[i]t is to be presumed that [parties to a joint powers agreement] acted reasonably and within the scope of their respective powers"]), and that the burden of showing otherwise should therefore be placed on the petitioner (*California Correctional Peace Officers Assn. v. State Personnel Bd.* (1995) 10 Cal.4th 1133, 1154 [43 Cal.Rptr.2d 693, 899 P.2d 79]), the trial court improperly

---

[3] Plaintiffs claimed below that section 6509 was inapplicable for the different reason that not all members of MERA *were exempt from local land use regulations.* As argued by the Zack plaintiffs in their opening trial brief, "MERA is only immune from local land use regulations if every member of MERA is immune from local land use regulations under Gov. Code, § 53090 et seq. Since only cities and counties are so immune, and since many of MERA's members are local agencies other than cities and counties, MERA is subject to the Town's building and zoning ordinances." The Pratt plaintiffs made the same argument, stating in their opening trial brief that "[n]one [of MERA's members] have the authority under the Government Code to circumvent local land use and planning laws by themselves. . . . Since the ability to circumvent Tiburon's land use and planning laws is not a power 'common' to all of the members, MERA . . . cannot elevate itself above those common powers to infringe upon Tiburon's sovereignty by attempting to cloak itself in the mantle of the powers of Marin County." These arguments, which fundamentally misconstrue section 6509, were not accepted by the trial court and are not advanced in this court.

imposed on MERA the burden of establishing that each of its members possessed legal authority to construct or operate an emergency communications system.

■ Application of the wrong standard of review is enough to justify reversal (*Kawasaki Motors Corp. v. Superior Court* (1985) 85 Cal.App.4th 200, 205 [101 Cal.Rptr.2d 863]), but in the interest of judicial economy we shall address and resolve the underlying legal issue.

"The power of eminent domain may be exercised to acquire property only for a public use. Where the Legislature provides by statute that a use, purpose, object, or function is one for which the power of eminent domain may be exercised, such action is deemed to be a declaration by the Legislature that such use, purpose, object, or function is a public use." (Code Civ. Proc., § 1240.010.) The trial court did not find that any of MERA's members lack the power of eminent domain, or that construction and operation of the emergency communications system at issue would not be a "public use"— that is, a "use which concerns the whole community or promotes the general interest in its relation to any legitimate object of government." (*Bauer v. County of Ventura* (1955) 45 Cal.2d 276, 284 [289 P.2d 1].) Impliedly conceding those issues, the court thought the "narrow" but paramount question was "whether all of MERA's members are *individually empowered* to construct and operate an emergency communications system." (Italics added.)

The court's declaration that all of MERA's members must be so "individually empowered" apparently does not mean the court believed all must possess *express* statutory authorization to do so. Although the trial court never discussed or even adverted to the doctrine of implied powers, we understand it to have concluded that the four agencies in question lacked even the implied power to construct and operate an emergency communications system.

■ Implied powers may arise not only by statute (see, e.g., Wat. Code, § 31000 [water districts may exercise powers "expressly granted or necessarily implied therefrom"]), but also under common law rules of statutory construction. (*Forest Lawn Co. v. City Council* (1963) 60 Cal.2d 516, 519–520 [35 Cal.Rptr. 65, 386 P.2d 665].) Two of the four local agencies the trial court focused upon, MMWD and the Marinwood Community Services District, are "districts of limited powers" (§ 56037); the Marin County Transit District was locally created pursuant to a special state statute (Pub. Util. Code, § 70011), and the Marin Community College District is a part of the *state public school system (Ed. Code, § 66700).* The precise legal nature of such districts is somewhat unclear. " 'A "district" has been variously characterized by the courts as a "public corporation," "municipal corporation,"

"quasi-municipal public corporation," "state agency," "public agency," "agency or auxiliary of the state," "public corporation for municipal purposes," "quasi-municipal corporation," and other equally unenlightening descriptions. A glance at the leading municipal text convinces one of the hopelessness of confining "districts," "public corporations," or "municipal corporations" within the neat box of a definition.' [Citation.] These 'instrumentalities of local government . . . defy simple definition or easy classification.' [Citation.]" (*Turlock Irrigation Dist. v. Hetrick* (1999) 71 Cal.App.4th 948, 952 [84 Cal.Rptr.2d 175].) Notwithstanding the definitional difficulty, districts of the sort we are concerned with here have generally been seen as sufficiently similar to municipal corporations as to be subject to many of the same general principles. (*Ibid.*, citing, by way of example, *La Mesa etc. Irr. Dist. v. Halley* (1925) 197 Cal. 50, 60–61 [239 P. 719].) It is settled that municipal corporations possess not only such powers as are expressly conferred on them by the Constitution or statutes, but also implied powers. (See, e.g., *Wiltshire v. Superior Court* (1985) 172 Cal.App.3d 296, 302 [218 Cal.Rptr. 199]; *Manteca Union High School Dist. v. City of Stockton* (1961) 197 Cal.App.2d 750, 754–755 [17 Cal.Rptr. 559].) This principle applies as well to "districts of limited powers." (See, e.g., *Water Quality Assn. v. County of Santa Barbara* (1996) 44 Cal.App.4th 732, 746 [52 Cal.Rptr.2d 184]; *Danley v. Merced Irr. Dist.* (1924) 66 Cal.App. 97, 105 [226 P. 847]; see also, *US Ecology, Inc. v. State of California* (2001) 92 Cal.App.4th 113, 132 [111 Cal.Rptr.2d 689] [implied powers of administrative agency].)

The implied powers of municipal corporations have variously been described as those "[p]owers necessarily arising from those expressly granted, . . . those reasonably inferred from the powers expressly granted," and those "[p]owers recognized as indispensable to local civil government to enable the municipality to fulfill the objects and purposes for which it was organized and brought into existence." (2A McQuillin, Municipal Corporations (3d ed. rev. 1996) § 10.12, p. 337, fns. omitted; see *Hurst v. City of Burlingame* (1929) 207 Cal. 134, 138 [277 P. 308]; *City of Salinas v. Pacific Tel. & Tel. Co.* (1946) 72 Cal.App.2d 494, 498–499 [164 P.2d 905]; *Frisbee v. O'Connor* (1932) 119 Cal.App. 601, 603–604 [7 P.2d 316].) The criteria are uncommonly flexible. The difference, if any, between powers that are "necessary" to the exercise of powers expressly granted and those which are "indispensable" is not readily apparent. Nor is there a precise definition of "indispensable powers," "further than the rule that the power must be indispensable as distinguished from merely useful or convenient . . . ." (2A McQuillin, Municipal Corporations, *supra*, § 10.12, pp. 337–338.) On the other hand, for purposes of determining whether a power is implied, the word "necessary" has been judicially defined in California as meaning convenient, useful, appropriate or suitable, *and not indispensable*. (*Danley v. Merced Irr. Dist., supra*, 66 Cal.App. at p. 105; accord, *South Pasadena v. Pasadena*

*Land etc. Co.* (1908) 152 Cal. 579, 590 [93 P. 490].) Moreover, "[w]hat is indispensable to the attainment and maintenance of the declared objects and purposes of a municipality has been said to be subject to 'change with changing circumstance,' so that 'what might not have been implied at one time may be implied at another time.'" (2A McQuillin, Municipal Corporations, *supra*, § 10.12, p. 338, fn. omitted.)

■ One of the criteria courts have employed to determine whether a power is implied is whether "the [L]egislature could have entertained an intention contrary to that implication." (2A McQuillin, Municipal Corporations, *supra*, § 10.12, p. 338.) That test is particularly appropriate here because the Legislature has unambiguously expressed its attitude concerning the object of the power at issue.

Due to California's unusual vulnerability to earthquake, fire and other natural disasters, our Legislature has long recognized the need "[t]o encourage the development and maintenance of emergency plans based on mutual aid, whereunder political subdivisions may most effectively protect life and property and mitigate other effects of emergencies." (§ 8579, subd. (h).) In 1970, when it created the State Office of Emergency Services (OES) (§ 8585 et seq.), the Legislature found "that it is the responsibility of the State of California to protect and preserve the right of its citizens to a safe and peaceful existence," and declared that "[t]o accomplish this goal and to minimize the destructive impact of disasters and other massive emergencies, the actions of numerous public agencies must be coordinated to effectively manage all four phases of emergency activity: preparedness, mitigation, response, and recovery." (§ 8588.3, subd. (a).) The coordinated delivery of emergency services depends heavily on the ability of the responsible public agencies to effectively communicate with one another in emergency situations, as the Legislature was well aware. (See, e.g., § 8593.1, authorizing investigation of the feasibility of establishing a "'Digital Emergency Broadcast System' network, to be used by local and state government agencies . . . .")

The need for effective emergency communications systems took on added urgency after the terrorist attacks on the World Trade Center and the Pentagon on September 11, 2001. In response to those events, the California Legislature enacted the Public Safety Communication Act of 2002. (§ 8592 et seq.) Finding that inadequate radio communication systems available to public safety and emergency response teams in California "restricts the ability of these teams to communicate with each other and can delay the delivery of critical resources" (Stats. 2002, ch. 1091, § 1(b)), the Legislature declared the need to encourage development of "[a]n integrated public safety communication system [that] will enable public safety and emergency response personnel

to communicate more quickly and efficiently during an emergency by allowing communication both within and among different public safety and emergency response teams." (*Id.*, § 1(c).) Elsewhere, the Legislature designated each county as "an operational area" that "may be used by the county and the political subdivisions comprising the operational area for the coordination of emergency activities and to serve as a link in the [statewide] communications system during a state of emergency or a local emergency." (§ 8605) The Legislature provided that OES, in coordination with state and local emergency management agencies, "shall jointly establish by regulation a standardized emergency management system for use by all emergency response agencies." (§ 8607, subd. (a); Cal. Code Regs., tit. 19, § 2400 et seq.) On behalf of the Marin County Operational Area, the Marin County Board of Supervisors adopted the "standardized emergency management system" in 1996. (Res. No. 96-158, Nov. 12, 1996.) One of the components of that system is an "Incident Command System" (§ 8607, subd. (a)(1)), which consists in part of "[i]ntegrated communications . . . managed through the use of a common communications plan . . . ." (Cal. Code Regs., tit. 19, § 2405, subd. (a)(3)(H).)

The unusual importance the Legislature has attached to the development of public safety and emergency communication systems, together with its designation of counties as "operational areas" for the coordination of emergency services, renders it highly improbable the Legislature entertained any intention contrary to the implication that local public agencies which regularly interact with large numbers of people or act as stewards of vital resources have the power to provide emergency services reasonably related to the protection of such people or resources in conditions of extreme peril. Judicial resistance to such an implied power, which would significantly undermine a declared legislative policy, must be avoided. (See *Manteca Union High School Dist. v. City of Stockton, supra,* 197 Cal.App.2d at pp. 754–755.) Because it relates to the protection of life and property in dire circumstances, a matter the Legislature has deemed of transcendent importance (see *Macias v. State of California* (1995) 10 Cal.4th 844, 856 [42 Cal.Rptr.2d 592, 897 P.2d 530]), the power to provide an emergency service is considerably easier to imply than most other unexpressed powers a public agency is likely to assert.

The trial court appears to have taken the position that the power to construct and operate an emergency communications system is an implied power only of public agencies expressly authorized to provide emergency services, such as police and fire protection. Given the importance our Legislature has attached to the provision of emergency services, specifically including emergency communications systems, and given the absence of any indication that this responsibility rests only with public agencies expressly

authorized to provide emergency services, we believe the trial court's approach is too restrictive. Disaster preparedness is necessarily incident to the provision of a much broader range of mandated public services.

■ For example, as previously noted, water districts such as MMWD possess the express power to construct and operate facilities that "make use of water." (Wat. Code, § 31042.) However, water is a vital resource, essential not only to irrigate crops and suppress fire, but also to sustain life in a variety of other connections. A water district must be able to rapidly respond to information that its water supply is contaminated or otherwise threatened, or that a storage or distribution facility is in danger, or that a forest fire creates an immediate need for large amounts of water. For these and related reasons, "public water systems" such as MMWD are required to have disaster preparedness plans "sufficient to address possible disaster scenarios." (§ 8607.2, subd. (a).) The Legislature has also specifically recognized the role local water districts have in implementing the "standardized emergency management system" earlier described. (§ 8607, subd. (a).) As we have noted, one of the chief purposes of this system is to ensure that public agencies at all levels of government can communicate effectively during disaster situations. (OES, Emergency Management in Cal. (Oct. 2003) pp. 7–8.) The Legislature has thus indicated that the express power to "make use of water" implies the power to employ such means as are reasonably necessary to protect the resource and those whose lives or property may be threatened by the failure of a water storage or distribution facility. Marin County's water resources, located in one of the most seismically active areas in the nation, are clearly exposed to danger, as are individuals who live near MMWD water facilities. Among numerous other water facilities, MMWD manages seven dams. Dam failure resulting from an earthquake or other cause might result not just in the loss of water, but the loss of life and injury to property. As an emergency communications system may be necessary to rapidly alert the endangered public and those who can assist in the protection of threatened water resources, a water district has the power to construct and operate such a system. (See *Marabuto v. Town of Emeryville* (1960) 183 Cal.App.2d 406, 410 [6 Cal.Rptr. 690]; see also 25 Ops.Atty.Gen. 164 (1955) [power to engage in rainmaking, which is not expressly authorized by statute, may be implied from general authority of an irrigation or water district to do any acts and to acquire any property necessary to furnish a water supply].)

■ The purpose of the Marin County Transit District is "to develop, finance, organize, and provide local Marin County transit service in a manner consistent with an overall San Francisco Bay Area regional transit system." (Pub. Util. Code, § 70010.) In carrying out this purpose, the district possesses the express power to "condemn in proceedings under eminent domain, or otherwise acquire, and hold and enjoy, real . . . property of every kind within or without the district necessary to the full or convenient exercise of its

powers. . . ." (*Id.*, § 70175.) A natural disaster or other emergency may endanger the safety of a public transportation system and those who use it, or create an urgent need for transportation services essential to the protection of an endangered population. The commission of violent criminal acts on buses and trains must also be anticipated. An emergency communications system permits a transit district to quickly learn of and rapidly respond to such emergencies, and the construction and operation of such a system may well be "necessary to the full or convenient exercise of its powers." (*Ibid.*) As has been said, "[t]he delegation of power to municipal corporations, without providing the mode for carrying such power into effect, impliedly gives them the right to select lawful and reasonable means whereby that power is to be carried out." (*Ravettino v. City of San Diego* (1945) 70 Cal.App.2d 37, 47 [160 P.2d 52].)

▪ The Marinwood Community Service District is statutorily authorized, as are all community service districts, to provide a myriad of public services, including those relating to fire and police protection, and ambulance, transportation and flood protection services. (§ 61600, subds. (d), (h), (m), (o), (q).) The power to construct an emergency communications system is so manifestly necessary to the existence and due functioning of an agency that has such responsibilities that it may be deemed an inherent power. (See 2A McQuillin, Municipal Corporations, *supra*, § 10.11, p. 333.)

▪ The Marin Community College District, the remaining MERA member whose power the trial court analyzed, administers postsecondary schools that are "a part of the public school system of this state." (Ed. Code, § 66700.) The governing board of the district, which is authorized to "[p]rovide auxiliary services as deemed necessary to achieve the purposes of the community college" (Ed. Code, § 70902, subd. (b)(11)), must plan for a natural disaster or other emergency, such as a violent criminal act on school grounds, that threatens the lives of students or others, or endangers school property. For example, in conditions of extreme peril, a district must be able to quickly summon assistance and evacuate a campus. (See Ed. Code, §§ 66210, 94600.) An emergency communications system designed to assist in such situations may therefore be deemed an "auxiliary service" necessary to achieve the district's purposes.

▪ All of the four districts just discussed must thus be viewed as possessing the implied power to construct and operate an emergency communications system. As plaintiffs have not shown that any other member of MERA lacks such power, we conclude that MERA has the "common power" to construct and operate an emergency communications system, that section 6509 therefore applies, and that, as a result, MERA is not subject to Tiburon's land use regulations.

## C. *MERA's Immunity is Not Impermissibly Delegated From the County*

The Zack plaintiffs and the Town of Tiburon argue that even if section 6509 is theoretically applicable, it does not operate to grant MERA the same exemption from local land use regulations as the County enjoys because a county cannot delegate its immunity to a joint powers agency. This argument is predicated on the proposition that the statutes which exempt counties and certain other "local agencies" from the need to comply with otherwise applicable building and zoning ordinances does not include joint powers agencies in the list of exempted agencies. (§§ 53090, 53091.) The flaw in this argument is the falsity of the assumption that MERA's immunity from Tiburon's land use regulations was delegated to it by the County. Section 53090 is the source of the intergovernmental immunity enjoyed *by the County*, but it is not the source of MERA's immunity, which results instead from direct operation of section 6509. (*Cooper v. Mountains Recreation & Conservation Authority, supra,* 61 Cal.App.4th at p. 1118.) Plaintiffs' reliance on *City of Burbank v. Burbank-Glendale-Pasadena Airport Authority* (1999) 72 Cal.App.4th 366 [85 Cal.Rptr.2d 28] is misplaced. That case held that the plaintiff city, which was a member of the defendant joint powers agency, did not delegate to the agency its power to review airport development plans. (Pub. Util. Code, § 21661.6.) The joint powers agency in *City of Burbank* did not invoke section 6509, the court did not mention it, and the reasoning of that case is simply not relevant to the applicability of that statute here.

Plaintiffs have not rebutted the presumption MERA acted within the scope of its authority. MERA possesses the "common power" to construct and operate an emergency communications system. The manner in which it exercises that power is therefore subject only to those restrictions that would apply to the County of Marin, the party designated by the joint powers agreement. (§ 6509.) Because the County is not subject to Tiburon's land use regulations (§ 53090), neither is MERA.[4]

---

[4] The trial court found not only that MERA was required to comply with Tiburon's land use regulations, but also that MERA failed to comply with section 65402. As pertinent, subdivision (c) of section 65402 states that a local agency shall not acquire real property for public purposes in a city (such as Tiburon) that has adopted a general plan "until the location, purpose and extent of such acquisition . . . [has] been submitted to and reported upon by the planning agency having jurisdiction, as to conformity with said adopted general plan or part thereof." MERA argues that it complied with section 65402 by applying to the Tiburon Planning Department for a conditional use permit for the Mt. Tiburon site and that, in any case, MERA is not subject to the statute to begin with. We find it unnecessary to decide whether MERA complied with section 65402. Clearly, due to the intergovernmental immunity, Marin County need not comply with Tiburon's general plan. (*Lawler v. City of Redding, supra,* 7 Cal.App.4th at pp. 783–784.) As we have said, because the restriction does not apply to the County, the party designated by the joint powers agreement, section 6509 renders it inapplicable to MERA.

**II., III.***

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

For the foregoing reasons, the judgment is reversed. Appellant MERA is awarded its costs on appeal.

Lambden, J., and Ruvolo, J., concurred.

A petition for a rehearing was denied May 7, 2004, and on May 13, 2004, the opinion was modified to read as printed above. The petition of all respondents and real party in interest for review by the Supreme Court was denied August 11, 2004.

---

*See footnote, *ante*, page 617.